# In the United States Court of Federal Claims

No. 13-245 C

(Revised and Filed **Under Seal** September 18, 2013)

Reissued for publication: September 18, 2013[1]

|  |  |
|---|---|
| SUPREME FOODSERVICE GMBH, | ) ) |
| Plaintiff, | ) |
| v. | ) Post-Award protest; Responsibility ) evaluation; Discussions; |
| THE UNITED STATES, | ) Responsiveness; Equality of |
| Defendant, and | ) evaluations. ) |
| ANHAM FZCO, | ) ) |
| Defendant-Intervenor. | ) |

*Thomas P. Humphrey*, Washington, DC, for plaintiff. *David Z. Bodenheimer*, *Jonathan M. Baker*, *James G. Peyster*, *Grant J. Book*, *Olivia L. Lynch*, and *Robert J. Sneckenberg*, Washington, DC, of counsel.

*Joseph E. Ashman*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant, with whom were *Stuart F. Delery*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Deborah A. Bynum*, Assistant Director. *R. Zen Schaper* and *Jeremiah Kline* (DLA), of counsel.

*Eric J. Marcotte*, Washington, DC, for intervenor defendant. *Kevin P. Connelly*, *Harold D. Lester, Jr.*, *Kelly E. Buroker*, *Jacob W. Scott*, and *Kyle E. Gilbertson*, of counsel.

## OPINION

**Merow**, Senior Judge.

In this post-award bid protest case, Supreme Foodservice GmbH ("Supreme" or "plaintiff"), an unsuccessful offeror, challenges the decision of the Defense

---

[1] This published version of the September 18, 2013 Revised Sealed Opinion incorporates proposed agreed redactions submitted by the parties.

Logistics Agency Troop Support ("DLA" or the "Agency") to award a Subsistence Prime Vendor-Afghanistan ("SPV") contract to ANHAM FZCO ("Anham" or "defendant-intervenor"[2]) under Solicitation No. SPM300-11-R-0063 ("Solicitation" or "Request for Proposal" or "RFP").

Before the court are: (1) Supreme's Motion for Judgment on the Administrative Record (AR) (ECF No. 26); (2) Defendant's Cross-Motion for Judgment on the AR (ECF No. 29); (3) Anham's Cross-Motion for Judgment on the AR (ECF No. 32); (4) Anham's Motion to Strike (ECF No. 31); (5) Supreme's Motion to Supplement the AR (ECF No. 35); and (6) Anham's Conditional Cross-Motion to Supplement the AR (ECF No. 41). As detailed below, Supreme has not established that DLA's decision to award the SPV contract to Anham was arbitrary, capricious, an abuse of discretion, or in violation of procurement law. Thus, Supreme's Motion for Judgment on the AR is denied and the Cross-Motions granted. The Cross-Motion and Motion to Supplement the AR and the Motion to Strike are granted in part and denied in part.

## I.   STATEMENT OF FACTS

### A.  The Solicitation And First Award Decision

On April 26, 2011, DLA issued its Solicitation for the SPV contract to supply and deliver a full line of food and other subsistence products to the United States military and other federally-funded customers at 205 delivery points in Afghanistan. (AR Tab 1 at 125, 127.) Subsistence products included a wide variety of commercially-available cafeteria-style food items. (AR Tab 32 at 6203.) This procurement was a continuation of DLA's prior SPV Afghanistan contracts, which Supreme, the incumbent, has been performing since 2005, pursuant to a competitively-awarded contract, and since 2010, under sole-source contracts. (AR Tab 43 at 6756, 8542.) Supreme's current sole-source contract expires on December 12, 2013. (AR Tab 44 at 6756.)

The Solicitation at issue was for a sixty-six month, fixed-price, indefinite-delivery/indefinite-quantity contract with estimated sales of $10 billion and a maximum of $30 billion including all pricing tiers and a surge. (AR Tab 1 at

---

[2] ANHAM is referred to as "Anham" in Agency and other documents. For consistency purposes "Anham" is used throughout this Opinion, including in quoted material.

125-26.) An award to other than the incumbent would occur at least 180 days prior to the expiration of the incumbent's contract. (*Id*. at 220.) During this time, the incumbent would remain the principal supply source. (*Id*.)

Offerors were to organize their proposals into two volumes – technical and price. (AR Tab 1 at 241.) The technical proposal would be evaluated under the following factors, subfactors and elements:

## I EXPERIENCE/PAST PERFORMANCE
   . . .
- A. Experience
  - A1. Experience (Size and Complexity)
  - A2. Experience (Key Personnel)
- B. Past Performance
- C. Socioeconomic Past Performance
- D. Ability One Past Performance

## II DISTRIBUTION SYSTEM/QUALITY ASSURANCE
   . . .
- A. Warehouse Location/Capacity and Resource Availability
- B. Airlift Capability
- C. Quality Control Assurance and Warehouse Procedures
- D. Product Protection/Food Defense
- E. Surge and Sustainment Capability

## III PRIVATE CONVOY SECURITY CAPABILITY

## IV OPERATIONAL SUPPORT
- A. Afghan National Employment - Afghanistan First - Southern Caucasus (SC)/ Central and Southern Asian States (CASA)
- B. Civil Reserve Air Fleet (CRAF)/Voluntary Intermodal Sealift Agreement (VISA)

## V SOCIOECONOMIC CONSIDERATIONS

(AR Tab 1 at 239-40.) Technical factors were to be weighed in descending order of importance and, when combined, Factors I through V were "significantly more important than price components." (*Id*. at 261.) In combination, Factors I, II and III were significantly more important than Factors IV and V. (*Id*. at 261.) Subfactor A (Experience) and Subfactor B (Past Performance) of Factor I (Experience/Past Performance) would be weighed equally, but had more weight than Subfactor C (Socioeconomic Past Performance) and Subfactor D (Ability One Past Performance)

which had equal weight. (*Id.* at 260.) Factor II (Distribution System Quality Assurance) included several Subfactors of equal importance: warehouse location, capacity and resource availability; airlift capability; quality control assurance and warehouse procedures; product protection/ food defense; and surge and sustainment capability. (*Id.* at 262, 266-67.) Factor III would evaluate the offeror's private convoy security capability, giving more favorable ratings to plans demonstrating a higher rate of successful execution. (*Id.* at 267.) Factor IV would gauge a proposal's support of Afghanistan National Employment initiatives and utilization of the Civil Reserve Air Fleet/Voluntary Intermodal Sealift Agreement. (*Id.*) Factor V would evaluate "[s]ocioeconomic goals on a comparative basis amongst all offerors." (*Id.* at 263, 267.)

Technical evaluation would be by ratings of Outstanding, Good, Acceptable, Marginal, and Unacceptable. (AR Tab 1 at 264.) A proposal would be rated "Outstanding" if it "meets requirements and indicates an exceptional approach and understanding of the requirements," "[s]trengths far outweigh any weaknesses" and the "[r]isk of unsuccessful performance is very low." (*Id.*) A "Good" rating was defined as "meets requirements and indicates a thorough approach and understanding of the requirements," "contains strengths which outweigh any weaknesses," and has a low risk of unsuccessful performance." (*Id.*) An "Acceptable" rating would mean the proposal "indicates an adequate approach and understanding of the requirements," and the "[r]isk of unsuccessful performance is no worse than moderate." (*Id.*) A "Marginal" rating would be given for a proposal that did "not clearly meet requirements and has not demonstrated an adequate approach and understanding of the requirements," with "one or more weaknesses which are not offset by strengths," and presenting a "[r]isk of unsuccessful performance [that] is high." (*Id.*) An "Unacceptable" rating would be given to a proposal that did not meet requirements. An "Unacceptable" proposal would not be eligible for an award. (*Id.*)

An award would be based on the best value. "The Government will award a contract resulting from this solicitation to the responsible offeror whose offer conforming to the solicitation will be most advantageous to the Government, cost or price and other non-price factors considered." (*Id.* at 260.) "[A]s proposals become more equal in their technical merit, the evaluated price becomes more important." (*Id.* at 261.)

Following a Technical and Business Proposal/Pricing evaluation, the contracting officer (CO), with the concurrence of the Source Selection Authority (SSA), would establish a competitive range, have discussions and accept final proposal revisions (FPRs) for evaluation and award. (*Id.* at 263.) The government reserved the right to "accept other than the lowest priced proposal as the overall best value. The Government will make a technical merit assessment based on information contained in the proposal and other information, which has or may be derived from sources other than the proposal." (*Id.*)

Initial proposals were submitted on July 13, 2011 (AR Tab 6 (Anham); Tab 8 (Supreme).) By September 16, 2011, four offerors, including Supreme and Anham submitted proposals. (AR Tab 32 at 6205.) DLA established a competitive range including all four offerors and opened discussions. (AR Tab 31 at 6007.) Following four rounds of discussions, offerors submitted their FPRs. (*Id.* at 6009.) The Agency's Source Selection Advisory Council (SSAC) met several times during the discussion period, and conducted a final meeting on February 13, 2012. (AR Tab 32 at 6202; Tab 33 at 6223.) The SSAC assessed both Anham's and Supreme's technical proposals with an overall rating of "Good." (*Id.* Tab 32 at 6210.)

On March 28, 2012, the SSAC concluded that Anham's proposal represented the best value to the government. (AR Tab 33 at 6218, 6236.) However, before awarding a contract, the CO must "make[] an affirmative determination of responsibility." 48 C.F.R. § 9.103(b). As detailed herein, generally, a responsibility determination is an evaluation of the putative awardee's ability to perform what was proposed. In this regard, on April 13, 2012, DLA requested a Formal Preaward Survey from the Defense Contract Management Agency (DCMA), to verify several aspects of Anham's proposal. (AR Tab 40 at 6259, 6267-71.) Upon completion of its evaluation, on June 8, 2012, DCMA recommended that Anham be awarded the contract.[3] (*Id.* at 6467-68.)

---

[3] There is no contention that DCMA's responsibility evaluation (AR Tab 40 at 6260-6496) was less than robust. Indeed, the more than 200-page submission details the sixteen government personnel involved and activities, actions, meetings, tasks and communications. (*Id.* at 6287-88.) Survey questions addressed included types of aircraft, security details, management organization, details of ████████████████████████████ proposed, pallet weight, and plans for transportation of fresh fruits and vegetables.

Following receipt and consideration of DCMA's responsibility evaluation, on June 19, 2012, the SSAC recommended to the SSA that the award be made to Anham. (AR Tab 33 at 6218.)  The SSA adopted the SSAC's recommendation, concluding that Anham represented the best value to the government.  (AR Tab 42A at 6558.1-6558.80.)  On June 21, 2012, the CO determined Anham was responsible (AR Tab 41 at 6497) and awarded Anham the contract on June 22, 2012.  (AR Tab 43 at 6559-6755.)

Separate from the SPV procurement, on June 19, 2012, DLA issued a sole-source bridge contract to Supreme for one year – from December 13, 2012 to December 12, 2013.  (AR Tab 44 at 6756-64.)  The Justification and Approval (J&A) required for other than full and open competition under the Competition in Contracting Act (CICA), 41 U.S.C. § 3301, included the CO's finding that the "bridge contract is required to maintain continuous prime vendor coverage and uninterrupted supply of vitally needed subsistence items until implementation of the new, competitively awarded prime vendor contract for foodservice support can be put in place."  (AR Tab 44 at 6756.)  The J&A cited changed circumstances in Afghanistan, including the closure of the main Pakistan-Afghanistan supply route due to tensions between Pakistan and the United States, which could extend the implementation phase of a new contractor from six to ten months.  (*Id*. at 6757-58.)  The CO who signed the J&A for the non-competitive Supreme bridge contract was also the CO for the SPV competitive procurement.

## B.  GAO Protests and the Second Award Decision

On July 5, 2012, Supreme filed a protest with the Government Accountability Office (GAO) challenging the award of the SPV contract to Anham.  This triggered an automatic stay of Anham's performance under 31 U.S.C. § 3553(d)(3)(A), and the Agency accordingly suspended performance pending resolution of the protest.  On October 11, 2012, GAO partially sustained Supreme's protest, concluding that the Agency's evaluation of Factor I (Experience/Past Performance) was inconsistent and unreasonable and resulted in unequal treatment of offerors, noting that Anham's proposal was rated Outstanding for Subfactor A, Element 1 (Size and Complexity) despite the fact that none of the individual contracts submitted met the specific dollar threshold of that element.  The GAO recommended that the Agency reevaluate Supreme's and Anham's proposals under Factor I (Experience/Past Performance) "in a manner that is reasonable and consistent with the solicitation's evaluation criteria,"

and then conduct a new price/technical tradeoff analysis.   The GAO further recommended that if, upon reevaluation, Anham's proposal was not determined to be the best value, the Agency should terminate Anham's contract and make a new award on the offer that was.[4]   *Supreme Foodservice GmbH*, B-405400.3, *et al.*, Oct. 11, 2012, 2012 CPD ¶ 292.   (AR Tab 45BB at 7726-40.)

The government followed the GAO's recommendation, agreeing to perform a limited reevaluation of Factor I and a new price analysis.  On October 20, 2012, DLA announced it would perform a limited reevaluation of Factor I (Experience/Past Performance) which included the Size and Complexity Element, and conduct a new tradeoff analysis, stating that the Agency did not intend to reopen negotiations, but after the reevaluation "will make a new award decision." (AR Tab 47 at 7757.)

On October 26, 2012, counsel for Supreme sent DLA's Chief Counsel and the CO a letter request for the expansion of corrective action, asserting *inter alia*, that according to the Afghanistan government and local community leaders, "Anham is constructing a warehouse [in Bagram] on land it does not own and for which it does not have proper authorization to use for that purpose." (AR Tab 48 at 7761-62 (footnote omitted).)   Two Afghan documents submitted with the letter (with translations provided by Supreme) stated that Afghanistan citizens and a sector of the Afghanistan Parliament understood that the Bagram land could not be used for the SPV contract.   (*Id.* at 7779-85.)   The Bagram warehouse was to provide approximately fifty percent of the warehousing in Anham's proposal.  Supreme indicated it was "not sufficiently familiar with the facts and Afghan law to verify that Anham has acted unlawfully as alleged." (*Id.* at 7762 n.1.)   Also submitted was an

---

[4] The GAO also noted that Supreme raised a number of other allegations which did not provide an additional basis to sustain the protest or expand the recommended action.  These included Supreme's contentions:

> that the agency improperly failed to amend the solicitation to reflect its actual requirements; that the agency conducted unequal discussions by accepting post-FPR proposal submissions from Anham but not Supreme; and that the agency's affirmative determination of Anham's responsibility was flawed due to an incomplete analysis of Anham's financial capability.  We have reviewed and considered each of Supreme's allegations, along with the entire evaluation record, and conclude that none furnishes any additional basis to sustain the protest.

(AR Tab 45BB at 7739.)

email with vague allegations from an unknown individual questioning Anham's business integrity. (*Id*. at 7798-7800.)

These assertions did not alter the CO's responsibility determination. The CO wrote in a Memorandum for the Record that the requirements of the Solicitation had not changed, the original finding of responsibility remained, further inquiry was not warranted, and any performance concerns could be handled as matters of contract administration:

> Anham was determined responsible at the time the original award was made. If the original award decision is affirmed, DLA would not need to reconsider the original responsibility determination because the requirements of the solicitation were not otherwise amended or changed. Similarly, the [CO] is not aware of any independent information substantiating the allegations raised by Supreme which would warrant further inquiry. To the extent any of the concerns raised by Supreme affect the ultimate awardee's performance, such issues will be dealt with as a matter of contract administration.

(AR Tab 57 at 7908.)

DLA also afforded Supreme the opportunity to clarify negative past performance data (AR Tab 50 at 7801; Tab 51 at 7803), and on December 5, 2012, the CO, the Reviewing CO and the Directorate of Subsistence, Supplier Operations, SPV Afghanistan completed their limited technical reevaluations. (AR Tabs 60 & 61.) Their finding and recommendation was that Anham's proposal was the best value to the government and Anham should be awarded the contract. Because the technical ratings of Anham and Supreme were close (Supreme's overall technical score [Outstanding] being only one adjective higher than Anham's [Good]), this made price more of a determinate.

> I am recommending that award be made to Anham as the best value to the Government based on its overall Good proposal, the many benefits Anham's offer provides to the Government, and the substantially lower price it is proposing. Anham's offer demonstrates a high level of technical merit and it is available at a significantly lower price (i.e. a 44.2% differential) than the one offered by Supreme . . . [and] the technical distinctions between the two proposals are not significant enough to merit the substantial price difference.

(AR Tab 62 at 8207.)

The respective technical ratings were as follows:

| Factors | Description | Anham | Supreme |
|---------|-------------|-------|---------|
| I | Experience/Past Performance | A | G |
| II | Distribution System/Quality Assurance | G | O |
| III | Private Convoy Security Capability | O | O |
| IV | Operational Support | O | G |
| V | Socioeconomic Considerations | O | O |
| Overall Rating | | G | O |
| Risk Level | | LOW | VERY LOW |

| | |
|---|---|
| A | Average |
| G | Good |
| O | Outstanding |
| M | Marginal |

(AR. Tab 62.)

The SSAC concurred in the technical evaluation report, concluding that "Anham's proposal represents the best value in terms of technical and pricing considerations." (AR Tab 64 at 8349.) The Revised Source Selection Decision by ██████, SSA, Deputy Commander, DLA Troop Support, upon review and independent analysis, also concluded that Anham's proposal represented the best value to the government. (*Id.*)

On December 7, 2012, DLA notified Supreme that corrective action was completed and Anham's proposal still provided the best value to the government. (AR Tab 65 at 8349-50.) Supreme's total evaluated price of $4,723,740,821.02 was $1,448,949,890.70 higher than Anham's total evaluated price of $3,274,790,930.32. (*Id.* at 8364, 8367.) On December 12, 2012, the Agency provided Supreme a debriefing concerning the reevaluation and second award of the contract to Anham. (*Id.* at 8363-68.)

On December 17, 2012, Supreme filed another GAO protest challenging the award decision (AR Tab 66A at 8369-8434), and supplemented the protest on January 25, 2013.[5] (AR Tab 66J at 8652-8743). Supreme asserted that: (1) DLA's award disregarded Anham's material proposal misrepresentation regarding its Bagram Farm warehouse, which should have resulted in a finding that Anham was not a responsible bidder and therefore should not have been awarded the contract; (2) DLA did not properly evaluate Anham's experience and past performance and treated offerors unequally; (3) DLA's past performance evaluation of Supreme's proposal was unreasonable under Factor I; and (4) DLA's best value tradeoff decision was unreasonable. In a March 8, 2013 GAO hearing, the CO testified regarding his responsibility determination and actions taken in response to the information Supreme submitted to the agency regarding Anham during corrective action.[6] (AR Tab 66X at 9069-9199.)

On March 27, 2013, GAO denied Supreme's second protest. *Supreme Foodservice GmbH*, B-405400.6, B-405400.7, Mar. 27, 2013, 2013 CPD ¶ __ (AR Tab 66BB at 9309-24). The GAO concluded that: (1) the record did not support claims that Anham made a material misrepresentation in its proposal regarding the availability of the Bagram warehouse site; (2) the agency's responsibility determination was not unreasonable; and (3) the agency's evaluation of experience and past performance was not unequal, but was reasonable and consistent with the terms of the solicitation. (*Id.*) Concerning other claimed errors, the GAO concluded that "[w]e have carefully considered all of Supreme's arguments, along with the record, and conclude that none furnish a basis on which to sustain the protest." (*Id.* at 9324 n.10.)

Supreme then filed this protest action.

---

[5] While the filing of Supreme's December 17, 2012 GAO protest should have invoked the automatic stay of Anham's performance under 31 U.S.C. § 3553(d)(3)(A), DLA did not issue a stop work order and notified GAO that urgent and compelling circumstances would not permit waiting for the GAO decision on the protest. On January 2, 2013, Supreme filed a protest in this court contesting this DLA stay override action which resulted in a decision that the stay override was invalid because it was issued arbitrarily and capriciously. *Supreme Foodservice GmbH v. United States*, 109 Fed. Cl. 369, 377, 398 (2013).

[6] Supreme did not object to the court's consideration of the testimony of the CO before the GAO. (Tr. 50-51.)

## II.   JURISDICTION AND STANDARD OF REVIEW

Jurisdiction over this procurement protest is conferred by 28 U.S.C. § 1491(b). Under 28 U.S.C. § 1491(b)(4), the Agency's protested contract award decision is reviewed pursuant to the standards set forth in 5 U.S.C. § 706. Thereunder, the court may set aside the Agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

Federal procurement determinations are arbitrary and capricious if the Agency "'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Ala. Aircraft Indus., Inc. Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). The "agency must examine the relevant data and articulate a satisfactory explanation of its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). "'If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.'" *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C. Cir. 1971)).

In this regard, "[i]t is well-established that contracting officers have a great deal of discretion in making contract award decisions, particularly when, as here, the contract is to be awarded to the bidder or bidders that will provide the agency with the best value." *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1355 (Fed. Cir. 2004); *see also Galen Med. Assocs. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004) (noting that because "the contract was to be awarded based on 'best value,' the contracting officer had even greater discretion than if the contract were to have been awarded on the basis of cost alone") (citing *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996)). *See also Glenn Defense Marine (ASIA), PTE, Ltd. v. United States*, 720 F.3d 901, 908 (Fed. Cir. 2013).

Supreme's contentions in this bid protest primarily concern legal errors, and in this regard, a procurement decision may be set aside not only if it lacked a rational basis but also if the agency's decision-making involved a violation of regulation or procedure. *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001). *De minimis* errors in the procurement process, however, do not justify relief. *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 1000 (Fed. Cir. 1996) (citing *Andersen Consulting v. United States*, 959 F.2d 929, 932-33, 935 (Fed. Cir. 1992)). The bid protest plaintiff bears the burden of proving that a significant error marred the procurement in question. *Id.* (citing *CACI Field Servs., Inc. v. United States*, 854 F.2d 464, 466 (Fed. Cir. 1988)).

If "the trial court determines [that] the government acted without rational basis or contrary to law when . . . awarding the contract[,] . . . it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005). Plaintiff again bears the burden of proof, and must "show that there was a 'substantial chance' [plaintiff] would have received the contract award but for the [government's] errors in the [procurement] process." *Id.* at 1358 (citations omitted). If a protestor can show that, but for the agency's procurement error, there was a substantial chance that it would have been awarded the contract, prejudice is established. *Id.* at 1353. "Prejudice is a question of fact." *Id.* (citing *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057 (Fed. Cir. 2000)).

## III.   CLAIMED ERRORS

Arguments raised in the extensive briefings were distilled, as presented at oral argument, into five areas:

A.   Supreme asserts that the Agency's responsibility evaluation, which included a finding that Anham would be ready to perform within six months, was legally erroneous because it was inconsistent with one of the findings in the J&A for Supreme's sole-source bridge contract, that any contractor other than the incumbent would require a ten-month period to prepare for performance;

B.   Supreme also asserts that this J&A finding for Supreme's bridge contract rendered Anham's procurement proposal non-responsive and ineligible for the SPV contract award;

-12-

C.  Supreme claims the Agency engaged in improper discussions as a part of its responsibility evaluation of Anham;

D.  Supreme contends that the Agency's evaluations of Anham's proposal regarding:  (a) past performance in relation to size and complexity and (b) surge capability, were unequal and inconsistent with the terms of the Solicitation; and, finally,

E.  Supreme alleges that the Agency's evaluation of Anham's responsibility failed adequately to investigate Anham's ability to use the Bagram Farms property for a warehouse.

## IV.  DISCUSSION

### A.  Was the Agency's responsibility evaluation of Anham inconsistent with the J&A for Supreme's sole-source bridge contract?

Supreme contends that the Agency's affirmative determination in this procurement as to Anham's responsibility was inconsistent with the contemporaneous finding in the J&A for Supreme's sole-source bridge contract that no contractor other than Supreme, as the incumbent, could provide continuity of mission-vital food services while a new contractor ramped-up for performance of the SPV contract.

Generally, a putative awardee's proposal sets forth its performance promises; a responsibility evaluation concerns whether the awardee can keep those promises. Before awarding a contract, the CO must evaluate the offeror's responsibility. *See* 48 C.F.R. § 9.103(b) ("No purchase or award shall be made unless the contracting officer makes an affirmative determination of responsibility.")

To be determined responsible, a prospective contractor must

(a) Have adequate financial resources to perform the contract, or the ability to obtain them (see 9.104 3(a));

(b) Be able to comply with the required or proposed delivery or performance schedule, taking into consideration all existing commercial and governmental business commitments;

(c)  Have a satisfactory performance record (see 48 CFR 9.104 3(b) and part 42, subpart 42.15).  A prospective contractor shall not be determined responsible or nonresponsible solely on the basis of a lack of relevant performance history, except as provided in 9.104 2;

(d)  Have a satisfactory record of integrity and business ethics (for example, see Subpart 42.15)[;]

(e)  Have the necessary organization, experience, accounting and operational controls, and technical skills, or the ability to obtain them (including, as appropriate, such elements as production control procedures, property control systems, quality assurance measures, and safety programs applicable to materials to be produced or services to be performed by the prospective contractor and subcontractors) (see 9.104 3(a));

(f)  Have the necessary production, construction, and technical equipment and facilities, or the ability to obtain them (see 9.104 3(a)); and

(g) Be otherwise qualified and eligible to receive an award under applicable laws and regulations. . . .

48 C.F.R. § 9.104-1.

A responsibility evaluation includes consideration of financial backing[7] as well as the ability to meet the operational requirements of the contract and may also encompass post-proposal information. *Centech Grp. Inc. v. United States*, 554 F.3d 1029, 1034 n.2 (Fed. Cir. 2009) ("Responsibility refers to an offeror's apparent ability and capacity to perform all contract requirements and is determined, not at proposal opening, but at any time prior to award of the contract based on any information received by the agency up to that time."); *Advanced Am. Constr., Inc. v. United States*, 111 Fed. Cl. 205, 221-22 (2013); *Mack Trucks, Inc. v. United States*, 6 Cl. Ct. 68, 71 (1984).

As noted, on April 13, 2012, the CO requested DCMA conduct a pre-award responsibility survey including on-the-ground verification of Anham's warehouse construction.  (AR Tab 40 at 6259.)  On May 23, 2012, DCMA transmitted an

---

[7] ███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████ (AR Tab 40 at 6430, 6446, 6456,  6460.)

extensive report to DLA (*id.* at 6284-6496) that "DCMA Afghanistan assembled a dedicated and professional acquisition team to provide an in-depth and detailed survey to assist with your contract award decision. The pre-award survey included site visits at three locations in Afghanistan, meetings with the ANHAM Senior Management and the review of contractor provided source documentation." (*Id.* at 6281.) DCMA reported that the Bagram warehouse was not completed by March 15, 2012 as represented by Anham in its FPR. Rather, the then-current target was July 2012, in part because Anham was waiting for an award decision. (*Id.* at 6290.)

The CO's subsequent responsibility report dated June 21, 2012, analyzed Anham's financial capability, performance record, integrity, organization, experience, accounting, operational controls and technical skills. (AR Tab 41 at 6497-99.) The CO concluded that Anham could comply with the delivery and performance schedule, measured from the actual contract award date, and had adequate resources to do so:

> 2. PERFORMANCE SCHEDULE: After taking into consideration all of Anham's existing commercial and governmental business commitments, I have determined that Anham is able to comply with the required delivery and performance schedule of the [SPV] contract. The duration of the contract is for a term of 66 months, with three separate pricing tiers. The first tier shall begin on the award date for a 30 month period (inclusive of a 6 month ramp-up period followed by a 24-month performance period); the second tier shall be for the following 18 month performance period; the third and final tier shall be for an 18 month performance period following the second 18-month performance period. During the first tier, the contract includes a six month implementation phase (or ramp-up period) which is defined as the timeframe which begins immediately after award and ends when the first order is placed. The ordering period begins after the first order is placed. Performance period options are not being used in this contract. Dependent upon the specific customers, deliveries shall average 1-3 times per week to each customer, unless the customer and the contractor agree upon more or less frequent stops. Based on all of its existing contracts and its technical proposal, Anham has adequate resources to meet the performance schedule of the contract.

(*Id.* at 6498.)

Acknowledging that Anham's warehouse construction schedules had been extended, the CO determined that Anham had resources to complete construction within sixty days after award and had the necessary trucking and air transportation facilities to support the warehouses:

-15-

6. PRODUCTION, CONSTRUCTION, AND TECHNICAL EQUIPMENT AND FACILITIES: I have determined that Anham has the necessary production, construction and technical equipment and facilities or the ability to obtain them for use on the [SPV] contract. Although Anham does not currently have completed operational warehousing, construction to build an adequate warehouse is currently in place and set to be finished 60 days after award. Furthermore, Anham has more than sufficient open yard spacing for outbound staging and for truck receiving, which will ensure a smooth flow of outbound and inbound trucks allowing Anham to meet the requirements of the contract. Anham has sufficient material handling equipment and trucking assets to perform successfully on the contract and has also demonstrated that, if necessary, additional assets can be obtained within 24 hours to 30 days. Anham also has sufficient airlift experience and capability to ensure successfully inbound and outbound deliveries into and within Afghanistan.

(*Id.* at 6499.)

Supreme contends these findings were legally erroneous, specifically, the determination that Anham could have its warehouses constructed and operational within sixty days after contract award was at direct odds with the Agency's J&A for the Supreme bridge contract.

Supreme was the incumbent under the prior SPV contract. The contract was extended on several occasions. As of November 18, 2010, the date of the initial contract extension, the Agency planned for a competitive follow-on contract award by June 13, 2012. That date was then advanced to February 29, 2012 to allow for a ten month ramp-up period for a non-incumbent awardee. (AR Tab 44 at 6757.) The date of anticipated new contract award then slipped to June 22, 2012. (*Id.*) Due to "significant changes related to the contract, which affect the implementation period for any contractor other than the incumbent," (*id.*), a one-year, sole-source bridge contract was awarded to Supreme for a period from December of 2012 to December of 2013, with an estimated value of $1.5 billion, and a maximum of $4.5 billion under the surge option.[8] In justifying this non-competitive bridge contract award, as required by 10 U.S.C. § 2304,[9] Supreme contends that the CO "certified" that:

---

[8] While the one-year bridge contract had an estimated value of $1.5 billion, the price differential between Anham and Supreme's offers in the subject procurement was approximately $1.4 billion. (AR Tab 44 at 6756; Tab 65 at 8367.)

[9] (c) The head of an agency may use procedures other than competitive procedures only when

The proposed bridge contract is required to maintain continuous prime vendor coverage and uninterrupted supply of vitally needed subsistence items until implementation of the new, competitively awarded prime vendor contract for foodservice support can be put in place. The use of the (c)(1) authority is necessary because the required foodservice supplies are available only from the current contractor in the timeframe required, and award to any other source would result in unacceptable delays in fulfilling the agency's requirements.[10]

---

(1) the property or services needed by the agency are available from only one responsible source or only from a limited number of responsible sources and no other type of property or services will satisfy the needs of the agency;

(2) the agency's need for the property or services is of such an unusual and compelling urgency that the United States would be seriously injured unless the agency is permitted to limit the number of sources from which it solicits bids or proposals;

(3) it is necessary to award the contract to a particular source or sources in order (A) to maintain a facility, producer, manufacturer, or other supplier available for furnishing property or services in case of a national emergency or to achieve industrial mobilization, . . .

. . .

(f)(1) Except as provided in paragraph (2), the head of an agency may not award a contract using procedures other than competitive procedures unless

> (A) the contracting officer for the contract justifies the use of such procedures in writing and certifies the accuracy and completeness of the justification;

> (B) the justification is approved
>
> > . . .
>
> > (ii) in the case of a contract for an amount exceeding $10,000,000 (but equal to or less than $75,000,000), by the head of the procuring activity (or the head of the procuring activity's delegate designated pursuant to paragraph (6)(A))[.]

10 U.S.C. § 2304.

[10] The J&A was certified by Dennis Strolle, the Contracting Officer, to the best of his knowledge and belief on June 11, 2012. ▉▉▉▉▉▉▉, Chief, Afghanistan/OCONUS Prime Vendor Subsistence Supplier Operations; ▉▉▉▉▉▉▉, Chief OCONUS Prime Vendor Subsistence Supplier Operations; ▉▉▉▉▉▉▉, Director, Subsistence Supplier Operations; and ▉▉▉▉▉ ▉▉▉▉▉, Troop Support Competition Advocate all concurred. ▉▉▉▉▉▉▉, DLA Counsel - Troop



(AR Tab 44 at 6756.) Multiple protests on the SPV award were anticipated, and with resulting stays, this could postpone performance by three to four months. (*Id.* at 6759.) A "longer implementation period, which is likely to last approximately ten (10) months instead of the originally planned six (6) months" was recited. (*Id.* at 6757.) An underlying assumption, Supreme reasons, is that Anham could not meet the six month ramp-up. Supreme asserts this finding is inconsistent with the responsibility determination by the same CO in the separate SPV procurement and renders the responsibility determination legally indefensible. Lacking responsibility, Anham would have been ineligible for an award and the SPV contract should have gone to Supreme, supplying the requisite prejudice.

The Supreme bridge contract J&A recited:



there is a reasonable expectation that transition to full performance by██████████████████████████████████ Due to the uncertainties of transitioning performance on this major requirement being performed in a war zone, including the new contractor's need██████████████████████████████████████████████ In addition, this bridge contract provides a "fallback" in the event that, for whatever reason, the new contractor is unable to provide the required support, thus mitigating potential performance risk under the new contract. This bridge contract is therefore required to assure uninterrupted, continued foodservice support to the subject customers after December 12, 2012, until the follow-on contractor completes transition and proves capable of assuming full performance. In any event, once the awardee of the competitively awarded contract reaches full operational capacity, and the guaranteed minium has been met, no additional orders will be placed against the bridge contract.

(*Id.* at 6759.)

Supreme's attack on the Agency's SPV contract responsibility determination faces a high hurdle. "'Contracting officers are "generally given wide discretion" in

---

Support reviewed the justification for legal sufficiency and██████████, Executive Director, Troop Support Contracting and Acquisition Management reviewed the justification and recommended approval. DLA General Counsel reviewed the justification and DLA Competition Advocate reviewed and recommended approval. It was approved on June 21, 2012, by███████████, Senior Procurement Executive, Defense Logistics Agency on June 21, 2012. (AR Tab 44 at 6762-64.)

making responsibility determinations and in determining the amount of information that is required to make a responsibility determination.'" *Bender Shipbuilding & Repair Co., Inc. v. United States*, 297 F.3d 1358, 1362 (Fed. Cir. 2002) (citing *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1334-35 (Fed. Cir. 2001)); *see News Printing Co. v. United States*, 46 Fed. Cl. 740, 746 (2000) ('"A contracting agency has broad discretion in making responsibility determinations since it must bear the brunt of difficulties experienced in obtaining the required performance.'") (quoting *House of Commc'ns & Graphics*, B-245920, 1992 WL 55054, at *2 (Comp. Gen. Mar 4, 1992). "When such decisions have a rational basis and are supported by the record, they will be upheld." *Bender Shipbuilding & Repair Co.*, 297 F.3d at 1362. "Although FAR [§] 9.105–1(a) does require the contracting officer to have, or to obtain, enough information to make a responsibility determination, the contracting officer is the arbiter of what, and how much, information he needs." *John C. Grimberg Co. v. United States*, 185 F.3d 1297, 1303 (Fed. Cir. 1999).

Supreme has the burden of establishing the arbitrary and capricious nature of the Agency's Anham responsibility determination and cites *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324 (Fed. Cir. 2001) in this regard. However, *Impresa* was a "rare case in which an explanation [was] required" for the responsibility determination, because the record before the CO included Italian court proceedings and other evidence possibly connecting the awardee to criminal activity in prior government contracts. *Impresa*, 238 F.3d at 1327-1328, 1338. Notably, in *Impresa*, the evidence that should have been considered was in the procurement record before the CO; accordingly, '[w]e leave to another day the question of whether extra-record evidence may be used to overcome the presumption of regularity." 238 F.3d at 1338 n.10. In the instant case, Supreme relies on the rationale used to support a separate procurement to assert that the SPV responsibility determination was arbitrary and capricious.

Defendants contend that the bridge contract was an acquisition distinct from the SPV procurement, and that findings from that J&A are not controlling in this procurement protest. The contracts, contractor, context and standards are different. Given the recited likelihood of multiple bid protests and stays on the SPV procurement, and the mission critical requirement to feed the troops, Supreme's bridge contract is asserted to have been a prudent hedge against the possibility of delays. Moreover, the Supreme bridge contract J&A was not an evaluation document

-19-

generated or relied on by the Agency in making the decision to award the SPV contract to Anham.

Even were the court to conclude that the J&A contains a finding that contradicts a material finding in the SPV procurement responsibility determination (and the court is making no such finding), no authority has been cited that would require the J&A findings in a separate procurement to be controlling. Were there any inconsistency, it cannot simply be assumed the J&A is correct and the SPV responsibility determination incorrect, particularly when there is record support for the SPV determination.

The bridge contract J&A was not part of the SPV procurement process and applied different legal principles. There was no protest proceeding over the sole-source award to Supreme. The J&A was required by the CICA to forgo competition; the SPV responsibility findings were in a competitive procurement, governed by separate procurement laws and regulations. The bridge contract J&A addressed a concern that circumstances in the wartime environment could result in an extended ramp-up period for a new contract but the troops had to be fed. The responsibility determination for the SPV contract expressed the then-present confidence that Anham could meet a six month requirement, and no extension of this period was provided in the SPV procurement. The AR for the separate bridge contract award is not before the court, so a judicial review equal to that required by 28 U.S.C. § 1491(b)(4) for the SPV contract responsibility determination cannot be accomplished. The genesis of the inclusion of the bridge contract J&A in this case, was in the prior override case. *Supreme Foodservice GmbH v. United States*, 109 Fed. Cl. 369, 379 n.4 (2013) (granting plaintiff's motion to supplement the record in that case to which the government and intervenor expressed no objection).[11]

Furthermore, the time periods in the bridge contract J&A and in the SPV contract responsibility determination, alleged to be in conflict, are in different contexts. In the instant case, given the several protests and stays, the running of the six month ramp-up period is not a straight line. Indeed, when questioned at oral argument, counsel were not able to calculate how much of that time had run. In

---

[11] Also, as in the override case, the bridge contract J&A is attached as an exhibit to the Complaint in the instant case.

contrast, Supreme's bridge contract, while subject to earlier termination, is for a set time period.

The J&A included several reasons for a bridge contract. The bridge contract was a hedge against risk, not in any way an amendment to the SPV contract. The Agency found nothing to suggest that Anham will not successfully satisfy the six-month ramp up period. And, in that the time remaining on the six-month ramp-up is unknown, no inconsistency, arbitrariness, capriciousness or violation of law has been established.

Anham was not privy to the award requirements of the separate bridge contract, such as the J&A required for this sole-source award to Supreme. Akin to application of res judicata and collateral estoppel, the factual and legal contexts of the determinations for the bridge contract and SPV contract awards are diverse, precluding the result Supreme advocates. *See Peter Kiewit Sons' Co. v. United States Army Corps of Eng'rs*, 714 F.2d 163, 167 (D.C. Cir. 1983) (holding that a finding of responsibility did not affect debarment proceedings: "differences in focus, criteria, scope and decision making personnel make the present responsibility and debarment decisions entirely independent of each other."); *see also Bean Dredging Corp. v. United States*, 22 Cl. Ct. 519, 522-23 (1991); *cf. MG Altus Apache Co. v. United States*, No. 11-538C, 2013 WL 3064808, at *10-12 (Fed. Cl. May 24, 2013) (validating broad discretion in the responsibility analysis and concluding the CO was not unreasonable in considering performance of a prior joint venture in evaluating present responsibility of one of its members). Similarly, at oral argument, the government characterized Supreme's request to bind the Agency with findings made in another context involving another contractor as precluded by well-established precedent preventing estoppel against the government, citing *Heckler v. Community Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 60 (1984); *see also Office of Personnel Mgmt. v. Richmond*, 496 U.S. 414, 419-34 (1990) (limiting estoppel against the government). Because of the findings herein, it is not necessary further to examine estoppel in these circumstances.

Supreme has not established that the J&A for its sole-source bridge contract serves to render the responsibility determination for the separate SPV contract arbitrary and capricious.

**B.    Did the J&A findings supporting Supreme's bridge contract render Anham's procurement proposal non-responsive?**

In a variation of its first claimed error, Supreme asserts that the bridge contract J&A included a finding that no offeror other than Supreme, the incumbent, could attain a six-month implementation period, a material mission requirement. Thus, Anham's proposal provision that it could meet that schedule becomes a material misrepresentation which should have disqualified Anham's proposal as a matter of law as nonresponsive.

Supreme cites to language in the Solicitation specifying a 66-month contract, consisting of three pricing tiers, the first of which was for 30 months, including a 6 month ramp-up period. This language appears in the Introduction to Statement of Work, Supplies/Services and Prices and provides in relevant part:

> F.    The Government intends to **make one award**. The contract shall be for a term of 66 months, with three separate pricing tiers. The first tier shall be for a 30 month period (inclusive of a 6 month ramp-up period followed by a 24-month performance period); the second tier shall be for the following 18 month performance period; the third and final tier shall be for another 18 month performance period.

(AR Tab 1 at 126 (emphasis in original).)   This is the provision that Supreme contends makes a six-month implementation period required and material.

Defendants disagree with Supreme's underlying assumption that a six-month ramp-up schedule was a material provision of the Solicitation, contending rather that transition periods were aspirational and fluid, citing to another provision in the more than 300-page Solicitation that the Agency "intends" to include a six-month ramp-up period.

## II. CONTRACT IMPLEMENTATION PHASE

> In the event that a follow-on contract is awarded to a firm other than the incumbent contractor [Supreme],[12] the government **intends** to: (i) make award at least 180 days prior to the expiration date of the incumbent contract and (ii) establish a time phased transition schedule during the incumbent contract's final 120 to 180 days of operation. ... [T]he new contractor shall fully prepare to support all customers under the contract at least 30 days prior to expiration date of the incumbent contract.  It is the Government's intent to have all orders placed under the new contract when the incumbent contract expires.

(AR Tab 1 at 220 (emphasis supplied).)

The use of the word "intends" creates neither a firm nor a material requirement, defendant concludes; rather "the solicitation is clearly advising offerors that yes, the government intends, it's shooting for a six-month transition period, but it does reserve discretion to determine exactly when the handoff, when the nonincumbent awardee would assume full contract performance." (Tr. 56.)  "Intends," rather than "shall" or "will" also counsels against invalidating a subsequent Agency decision that a longer transition schedule was necessary, particularly given the hostile nature in which the contract is to be performed.  When questioned by the court, the government stated that reserved discretion in this regard was not limited to the six month period prior to the expiration of Supreme's incumbent contract, but could extend to additional bridge contracts through contract administration if necessary to continue to supply needed provisions. (Tr. 58-60.)  This flexibility makes sense in view of the hostile performance environment involved, the government states, and no authority is cited that precludes the retention of discretion in implementation or ramp-up in these circumstances.[13] (Tr. 57 ("[The contract is not going to be performed] in Nebraska.").)  Discretion under these circumstances does not support the rigidity and materiality of a six-month transition period.

---

[12]  In that the implementation phase does not apply to Supreme, its standing or ability to assert prejudice in the application or interpretation of this provision is questionable.  Because of the court's findings herein, it is not necessary to resolve potential issues in this regard.

[13]  During the ramp-up period Anham does not get paid.  The non-incumbent contractor's compensation commences when it begins to fill food orders.

The Solicitation also reserved discretion on the timing of implementation of performance by a non-incumbent awardee in the "best interest of the Government." (AR Tab 1 at 220 ("[T]he Government reserves the right to phase in customer ordering points when it is in the best interest of the Government.").)

The government insists there is no inconsistency between the intention to provide a six-month ramp-up while reserving the right to extend that period, but if Supreme's response that retention of discretion in an implementation period would create an illusory contract were valid, the government contends that any such error in the Solicitation would be patent, and must have been challenged prior to the deadline for submission of proposals. *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007). There being no suggestion the illusory contract argument was timely raised by Supreme, it must be considered to be waived.

Defendant adds that in addition to the bar of *Blue & Gold Fleet*, any inconsistency is resolved by an order of precedence in the Solicitation. Therein the Schedule of Supplies and Services (the section cited by the government) is at the top of that list.[14]

Anham took no exception to the six-month transition period. Anham's proposal provided for this transition (AR Tab 6A at 862, 951, 958-63), and Anham's contract includes this six-month transition period. (AR Tab 43 at 6737-38.)

---

[14]       (s) *Order of precedence.* Any inconsistencies in this solicitation or contract shall be resolved by giving precedence in the following order:

(1) The schedule of supplies/services.
(2) The Assignments, Disputes, Payments, Invoice, Other Compliance, and Compliance with Laws Unique to Government Contracts paragraphs of this clause.
(3) The clause at 52.212-5.
(4) Addenda to this solicitation or contract, including any license agreements for computer software.
(5) Solicitation provisions if this is a solicitation.
(6) Other paragraphs of this clause.
(7) The Standard Form 1449.
(8) Other documents, exhibits, and attachments.
(9) The specification.

(AR Tab 1 at 15.)

-24-

The Agency did not relax the six month requirement and indeed its contract not only provides that Anham will complete ramp-up activities in six months, but also establishes even more detailed milestones for that six-month ramp-up period – identifying specific tasks to be completed within 30, 60, 90, 120, 150 and 180 days after notification of contract award, contemplating that Anham would make its first order for supplies within 90 days, but would not make its first delivery until 180 days after it received the award. (AR Tab 43 at 6737-38.)  During the implementation phase, the incumbent contractor, Supreme, would "remain the principal source of food and non-food supplies."  (*Id*. at 6737.)  Moreover, the CO affirmatively determined, as part of the contract award process, that Anham was capable of meeting, and had adequate resources to meet, the existing performance schedule, including the six-month implementation period.  (AR Tab 41 at 6498.)  He made this decision after "taking into consideration all of Anham's existing commercial and governmental business commitments" and "[b]ased on all of [Anham's] existing contracts and its technical proposal."  (*Id*.)  The CO concluded that Anham had the "appropriate financial assets and ability to perform on the current contract."  (*Id*. at 6497.)  Such determinations are entitled to considerable deference.  *Bender Shipbuilding & Repair Co. v. United States*, 297 F.3d 1358, 1362 (Fed. Cir. 2002).

Anham has consistently represented it will comply with the six-month ramp-up period (and Supreme points to no evidence in the direct procurement to the contrary).[15/]  Accordingly, Supreme's complaints concerning responsiveness in this regard must be rejected.  *Blount, Inc. v. United States*, 22 Cl. Ct. 221, 226-27 (1990).

## C.   Did DLA hold discussions with and allow Anham to modify its FPR without affording other offerors the same opportunity?

Supreme raises two protest categories in this regard.  First, Supreme claims that because the Agency downgraded Anham's rating concerning its warehouse construction schedule, Anham must have revised its proposal.  If Anham revised its proposal, it must have been the result of discussions.  If there were discussions between the Agency and Anham, Supreme was entitled to, but was not given, the same opportunity.  Secondly, Supreme avers that the rating downgrade resulted from

_____

[15/] Again, because of the various stays and delays, no party was able to inform the court when the six-month ramp-up period expires or expired.

material misrepresentations in Anham's proposal which should have rendered it ineligible for an award.

### 1.  The Agency engaged in a responsibility evaluation, not discussions.

The 126-page Revised Source Selection Document following the responsibility evaluation of Anham (which included financial as well as technical capability to perform the entire contract, not just the warehouse construction), including data from the evaluation, again concluded that Anham's proposal offered the best value to the government. The detailed analysis noted the reduced pace of Anham's construction activity, reporting Anham "does not currently have operational warehousing, or layout and open capacity to fulfill the needs of this contract; however it demonstrated how this can be obtained. . . ." (AR Tab 64 at 8332.) The CO noted that completion of warehouse construction was scheduled for approximately two months following the projected award date, which was within the Solicitation and contract requirements. Nevertheless, the Agency downgraded Anham's rating in Subfactor A (Warehouse Location/Capacity and Resource Availability) of Factor II (Distribution System/Quality Assurance) from Acceptable to Marginal (*Id.* at 8256), a reduction that did not affect Anham's ratings for any of the Factors or its overall rating.

FAR 9.106 Pre-Award Survey Information - Anham:

On April 16, 2012, in accordance with FAR 9.106, the [CO] requested DCMA conduct a pre-award survey on the proposed awardee, Anham. The [CO] requested the DCMA pre-award survey to evaluate Anham's financial capability to perform the requirements of the contract and verify a list of Anham's technical capabilities, including but not limited to, the construction status of its proposed warehouses, the number of pallet positions, key personnel, and number of assets (trucks, material handling equipment, etc). On May 25, 2012, the [CO] received DCMA's pre-award survey report, exclusive of the financial capability assessment. On June 8, 2012, after the submission of additional information related to Anham's financial capability, the [CO] received DCMA's financial capability assessment. The pre-award survey report provided responses to the [CO's] specific requests regarding Anham's technical capability. With respect to the financial capability of Anham, DCMA's pre-award survey indicated that it recommended completing award to Anham.

In regard to the technical capability assessment, the [CO] determined that the pre-award survey contained a number of discrepancies that did not match Anham's proposal.  The [CO] alerted me, as the SSA, of the specific discrepancies between Anham's FPR and the DCMA pre-award survey so that I could use the information in determining whether the technical panel's rating would need to be adjusted.  **As discussed below, I have determined as the SSA that the discrepancies between Anham's FPR and the DCMA pre-award survey would result in Anham's technical rating for Factor II, Subfactor A, Warehouse Location/Capacity/Resource Availability to be changed from an Acceptable to a Marginal.  As further discussed in the appropriate sections of this document, Anham's other subfactor, factor and overall ratings are not affected by the discrepancies.**  The discrepancies related to Subfactor II.A are as follows:

Regarding Anham's construction timeline, Anham's proposal indicated that both its Bagram and Kandahar facilities were under construction, were not contingent upon award, and were scheduled to be completed in March 2012.  However, the DCMA pre-award survey found that although warehouse construction had begun, the warehouse construction was not completed by March 2012 and key tasks in the construction effort have been deferred until an award decision is made.  Based on Anham's current schedules and its own projected May 2012 award date, construction efforts are projected for completion in July 2012, approximately two months after Anham's projected award date.

(Tab 64 at AR 8253-54 (emphasis supplied).)

To illustrate that the subfactor downgrade did not alter Anham's factor or overall ratings, the Technical Ratings for Anham and Supreme following Anham's downgrade (bolded and noted "***") were as follows:

| Factors | Description | Anham | Supreme |
|---|---|---|---|
| **I** | **Experience/Past Performance** | **A** | **G** |
| | Subfactor A  Experience | A | O |
| | Element 1  Size and Complexity | M | O |
| | Element 2  Key Personnel | O | O |
| | Subfactor B  Past Performance | A | A |
| | Subfactor C  Socioeconomic Past Performance | A | A |

| | | | |
|---|---|---|---|
| | Subfactor D  Ability One Past Performance | M | O |
| **II** | **Distribution System/Quality Assurance** | **G** | **O** |
| | Subfactor A  Warehouse Location / Capacity / Resource Availability | M *** | G |
| | Subfactor B  Airlift Capability | O | O |
| | Subfactor C  Quality Control, Assurance and Warehouse Procedures | G | O |
| | Subfactor D  Product Protection/Food Defense | O | O |
| | Subfactor E  Surge and Sustainment Capability | O | O |
| **III** | **Private Convoy Security Capability** | **O** | **O** |
| **IV** | **Operational Support** | **O** | **G** |
| | Subfactor A  Afghan Nat'l Emp't/Afghan 1st/SC/CASA | O | G |
| | Subfactor B  CRAF/VISA | O | O |
| **V** | **Socioeconomic Considerations** | **O** | **O** |
| **Overall Rating** | | **G** | **O** |
| **Risk Level** | | Low | Very Low |

| | |
|---|---|
| A | Average |
| G | Good |
| O | Outstanding |
| M | Marginal |

(AR Tab 64 at 8226.)

After a summary description of Anham's various complementary facilities such as its potato chip factory, bakery, water bottling plant, pallets, material handling equipment and the like, the SSA concluded:

> Anham does not currently have operational warehousing, or layout and open capacity to fulfill the needs of this contract; however it demonstrated how this can

be obtained and has operational warehousing under construction in Afghanistan. Although completion of construction of its operational warehousing and support facilities is contingent upon award, Anham has indicated that this can be accomplished within 60 days after award. In addition, Anham has leased in place for the duration of the proposed award for the two warehouses that it does not own. Anham has two (2) existing co-located facilities in Kabul, owned and operated by team member████████, situated on land leased from an Afghanistan entity. Anham has provided a copy of the land lease in its proposal. The Kandahar warehouse was purchased by Anham and is now owned by its related party,█████. With regard to the Bagram Farm warehouse facility, the land is subject to a lease agreement between the Government of Afghanistan and Anham's Afghanistan business partners, which have a ████████ownership interest. Once the warehouses are completed, Anham will perform a majority of the operation from vendor owned facilities. In case of any further delay on the construction, Anham indicated that the team will use the currently completed███ warehouses, which has sufficient pallet space, to store products and perform the contract.

(*Id.* at 8255.)

While admitting that the Agency may properly consider post-bid, pre-award information in determining responsibility, Supreme contends that the effect of the Agency's responsibility evaluation was an amendment to its proposal.

> MR. HUMPHREY: The communications in question occurred in the context of a preaward survey. That's correct, but it's important to understand, Your Honor, we are not arguing that the government somehow improperly considered that information. They can consider whatever information they want. The question is what are the legal consequences of their consideration of the information and what they do with it.

(Tr. 27.)

Supreme poses the rhetorical question "[i]f there was no new proposal, why would there be a new evaluation rating?" (*Id.*) Supreme concludes these circumstances essentially constituted prohibited one-party discussions and proposal amendment, and that according to well-established procurement law, an equal opportunity should have been afforded to Supreme, but was not. With that opportunity, as detailed hereinafter, Supreme predicts it would have significantly lowered its price due to other external circumstances. Supreme, as the next-highest-ranked offeror claims it was prejudiced, entitling it to the injunctive and other relief sought. (Tr. 27-28.)

As noted, following initial proposals, as required by regulations, the Agency conducted negotiations and several rounds of discussions with offerors within the competitive range, which were followed by proposal revisions. However, discussions and responsibility are two distinct and disparate steps in federal procurements. Discussions precede an award decision and must be extended equally to all offerors in the competitive range.[16] While in the competitive range, Supreme does not deny

---

[16] Discussions are governed by 48 C.F.R. § 15.306 which provides in part:

d) Exchanges with offerors after establishment of the competitive range. Negotiations are exchanges, in either a competitive or sole source environment, between the Government and offerors, that are undertaken with the intent of allowing the offeror to revise its proposal. These negotiations may include bargaining. Bargaining includes persuasion, alteration of assumptions and positions, give-and-take, and may apply to price, schedule, technical requirements, type of contract, or other terms of a proposed contract. When negotiations are conducted in a competitive acquisition, they take place after establishment of the competitive range and are called discussions.

(1) Discussions are tailored to each offeror's proposal, and must be conducted by the contracting officer with each offeror within the competitive range.

(2) The primary objective of discussions is to maximize the Government's ability to obtain best value, based on the requirement and the evaluation factors set forth in the solicitation.

(3) At a minimum, the contracting officer must, subject to paragraphs (d)(5) and (e) of this section and 15.307(a), indicate to, or discuss with, each offeror still being considered for award, deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond. The contracting officer also is encouraged to discuss other aspects of the offeror's proposal that could, in the opinion of the contracting officer, be altered or explained to enhance materially the proposal's potential for award. However, the contracting officer is not required to discuss every area where the proposal could be improved. The scope and extent of discussions are a matter of contracting officer judgment.

48 C.F.R. § 15.307(b) provides in relevant part:

The contracting officer may request or allow proposal revisions to clarify and document understandings reached during negotiations. At the conclusion of discussions, each offeror still in the competitive range shall be given an opportunity

the Agency engaged it in discussions which resulted in proposal revisions, including a deadline to submit its FPR.  In contrast, responsibility applies not only after discussions and the deadline for submission of final proposals, but after the selection of the offer that presents the best value to the government.  *See* 48 C.F.R. §§ 9.103 and 9.104-1.  No authority is cited that a putative awardee may amend its final proposal as part of this evaluation, or as Supreme requests, reopen competition and allow unrestricted revision options to all in the competitive range.

In determining whether the Agency's responsibility evaluation was a defacto discussion, Anham contends that this inquiry should be determined solely on the procurement record (Tr. 93), and that Supreme has not established that there was a relaxation or modification of Solicitation requirements for Anham – any advantage or favor – the common element in precedent concerning error in this regard.  And, to reiterate, Anham took no exception to the six-month ramp-up provision; its proposal directly addressed how it would meet that provision; and Supreme does not cite to any procurement evaluation analysis to the contrary.  Even if the unilateral rating downgrade were to be considered a proposal revision, it was a negative, not the favorable treatment contemplated under regulations governing discussions.  There were no unilateral exchanges that favored Anham.  48 C.F.R. § 15.306(e)(1) ("government personnel . . . shall not engage in conduct that – (1) [f]avors one offeror over another").  "Favor" assumes conferring an advantage.  Anham did not revise its proposal. Neither Anham's scoring nor ranking increased *vis a vis* Supreme's as a result of this action.  Anham's FPR remained the operative proposal that was accepted.  The Agency's responsibility due diligence was not only lawful, but required under 48 C.F.R. § 9.106.

> MR. ASHMAN: … [W]e're aware of no caselaw that says unequal discussions occur when there's information that reflects negatively on the party that the agency considers, that if they consider negative information that lowers the score, then they have to go out and let other offerors submit information to improve their proposal.

(Tr. 71.)

---

to submit a final proposal revision.  The contracting officer is required to establish a common cut-off date only for receipt of final proposal revisions.

Anham asserts that DCMA's analysis and communications were not "discussions," citing *Allied Technology Group, Inc. v. United States,* 94 Fed. Cl. 16, 44 (2010) ("Discussions occur when the agency indicates to an offeror 'significant weaknesses, deficiencies, and other aspects of its proposal that could be altered or explained to materially enhance the proposal's potential for award.'"). Besides not "enhancing" Anham's position, DCMA's survey included examination of Anham's ability to meet the operational requirements of the contract, a task required by regulation. *See* 48 C.F.R. § 9.106-1(a).

Anham also cites *DynCorp International, LLC v. United States,* 76 Fed. Cl. 528, 546-47 (2007) (applying GAO reasoning that "exchanges regarding offeror responsibility do not constitute discussions" including *Gen. Dynamics Ordinance & Tactical Sys.,* B–295987, B–295987.2, 2005 CPD ¶ 114, 2005 WL 1468418 (Comp. Gen. May 20, 2005) ("A request for, or providing of, information that relates to offeror responsibility, rather than proposal evaluation, does not constitute discussions and thus does not trigger the requirement to hold discussions with other competitive range offerors.") (citation omitted); and *A.B. Dick Co.,* B–233142, 89–1 CPD ¶ 106, 1989 WL 240388 (Comp. Gen. Jan. 31, 1989) (stating that "we have held that information that relates to responsibility or the correction of a clerical error does not constitute improper discussions or require that revised proposals be solicited from all offerors") (citation omitted)). *See also Consol. Eng'g Servs. v. United States,* 64 Fed. Cl. 617, 627 (2005) (citing *Kahn Instruments, Inc.,* B–277973, 98–1 CPD ¶ 11, 1997 WL 811931 (Comp. Gen. Dec. 15, 1997), and *A.B. Dick Co.,* B–233142, 89–1 CPD ¶ 106, at 3, 1989 WL 240388).

The "acid" test for "discussions" is, according to Supreme, whether or not the effect of the communications was a proposal revision, citing authorities, including *Hunt Buildings Co. v. United States,* 61 Fed. Cl. 243, 277 (2004) and *Dubinsky v. United States,* 43 Fed. Cl. 243, 261 (1999). And, Supreme reasons that the Agency's evaluation of the Anham proposal subsequent to receipt of the pre-award survey conducted by DCMA was, in effect, an amendment to Anham's proposal. "Whether an agency afforded an offeror the opportunity to revise or modify its proposal is the acid test for determining whether discussions have been held." *Orca Nw. Real Estate Servs. v. United States,* 65 Fed. Cl. 1, 11 (2005). "Discussions occur when the agency indicates to an offeror 'significant weaknesses, deficiencies, and other aspects of its proposal that could be altered or explained to materially enhance the proposal's potential for award.'" *Allied Tech. Grp., Inc. v. United States,* 94 Fed. Cl. 16, 44

(2010).  This is simply not what occurred here.  No evidence is cited that Anham was offered, allowed or did revise its proposal following, as a part of, or result of DCMA's responsibility evaluation.  Anham submitted its FPR on February 6, 2012. (AR Tab 17 at 5764.)  This proposal remained its last.

Supreme has not established that any discussions and modification of Anham's proposal occurred such as to justify a further exchange of FPRs.

### 2.   No material misrepresentation was found in the responsibility evaluation.

While originally briefed, Supreme subsequently minimized its contention that material misrepresentations should have rendered Anham's proposal nonresponsive and ineligible for award.  Asserted misrepresentations include the status of Anham's construction projects.   Anham's proposal of December 7, 2011 states that construction of the Kandahar warehouse could be complete by March 15, 2012.  (AR Tab 17 at 4904.)  The March 15, 2012 date was reaffirmed in its February 6, 2012 FPR.  (*Id.* at 5363.)   The DCMA responsibility analysis noted the Kandahar warehouse would not be complete until July 2012.  (AR Tab 40 at 6290.)  Also, photographs taken on April 29, 2012 of the Kandahar warehouse and on May 1, 2012 of the Bagram Farm warehouse, assertedly contradicted Anham's proposal representations that those same warehouses would be complete by March 15th and comprise further evidence, Supreme contends, of material disconnects between Anham's proposal and the responsibility evaluation as well as inability to estimate construction completion.

Supreme also cites two discrete Kandahar warehouse construction tasks which Anham represented in its February 6, 2012 FPR as being 100% complete.  One task was ███[17/]████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

---

[17/]  (Electrical, mechanical and plumbing).

██████████████████████████████████████████████████(AR Tab 40 at 6352.)

For the Bagram Farm warehouse construction project, in its December 7, 2011 proposal, Anham represented February 28, 2012, as its completion date. (AR Tab 17 at 4904.)  On February 6, 2012, it was reported that this date had slipped "up to ten (10) days." (AR Tab 17 at 5362.)  DCMA's pre-award survey calculated that Anham would not finish the Bagram Farm warehouse until July 2012 (AR Tab 40 at 6290.)  And on June 21, 2012, the CO stated that construction would not be complete until "60 days after award." (AR Tab 41 at 6499.)

The court rejects Supreme's position that Anham's warehouse construction schedule in its proposal contained misrepresentations, a position that was also rejected by the GAO. (AR Tab 45BB at 7739 n.12.)[18]  There is no showing of any intentional falsity.  *See, e.g., Fulcra Worldwide, LLC v. United States*, 97 Fed. Cl. 523, 541 (2011) (finding no misrepresentation when the inclusion of information in proposal was done in good faith); *Unified Architecture & Eng'g, Inc. v. United States*, 46 Fed. Cl. 56, 65 (2000) (bid protester failed to establish misrepresentation absent evidence of intentional misrepresentation). Moreover, a material misrepresentation requires establishing that DLA relied on what has been determined to be an intentional misstatement. *See Acrow Corp. of Am. v. United States*, 97 Fed. Cl. 161, 175-76 (2011) (noting "[r]eliance on a misrepresentation is of critical importance" and lack of reliance means the misrepresentation is not material).  Supreme does not

---

[18] Supreme raised a variation of this argument in its first GAO protest, and again, while not specifically mentioned in its Decision, the GAO recited consideration and rejection of all arguments not mentioned.

> Supreme's protest includes numerous allegations other than those discussed above. For example, Supreme asserts that the agency improperly failed to amend the solicitation to reflect its actual requirements; that the agency conducted unequal discussions by accepting post-FPR proposal submissions from Anham but not Supreme; and that the agency's affirmative determination of Anham's responsibility was flawed due to an incomplete analysis of Anham's financial capability. We have reviewed and considered each of Supreme's allegations, along with the entire evaluation record, and conclude that none furnishes any additional basis to sustain the protest.

(AR Tab 45BB at 7739.)

contend that DLA relied on the original schedules; indeed, in this regard, the Solicitation does not require warehouse construction or capacity be ready at the time of the award.  Rather, the Solicitation stated:  "Offeror will discuss in detail any ongoing or proposed construction which will be necessary in support of their platform. . . .  Offeror will clearly address within their proposal whether construction is contingent upon award (to commence upon award announcement) or whether ongoing."  (AR Tab 1 at 246.)  In other words, construction could have commenced upon award, which militates against Supreme's position that these pre-award construction schedules were material and constituted misrepresentations.  Anham's proposal stated that its construction of the warehouses was not contingent on award.  (AR Tab 6A at 759 (noting that construction schedule contingent on the award was acceptable).)

Anham proposed ambitious construction in Afghanistan well in advance of, and without any assurance of, an award.  Revision of schedules does not mean that the original schedules were false.  DLA placed no reliance on Anham meeting interim construction schedules.  By February 6, 2012 – the date of Anham's FPR and four months before the June 22, 2012 award decision – the company had spent more than ███████████ on building the warehouses.  (AR Tab 17 at 5362.)  The original schedules slipped for a variety of reasons, including the slow pace of the procurement.

Construction schedules could be contingent on an award.  As the award date extended, any implementation period moved with it.  Under Supreme's interpretation, despite spending more than ███████████ dollars before being selected as the putative awardee, Anham should have completed warehouse construction by March 15, 2012, prior to the June 22, 2012 contract award.  This the Solicitation does not require.  Indeed, Supreme's assertion is contrary to the Agency's responsibility determination which, following extensive analysis, concluded that Anham could perform as represented.  The almost 200-page Solicitation does not require the schedule precision Supreme insists upon, and comprises a matter on which Supreme had no competitive concern.  As the incumbent contractor, its warehouses were already built and had been in use for years.

For the foregoing reasons, the court concludes that Anham's proposal did not contain material misrepresentations that would render either its proposal or the Agency's responsibility determination legally infirm.

> **D.     Was evaluation of Anham's proposal for Subfactor A (Experience) and Subfactor B (Past Performance) of Factor I, and Subfactor E (Surge & Sustainment) of Factor II, legally erroneous?**

Supreme contends that the Agency's evaluation of past performance, size and complexity, and surge and sustainment capability were legally erroneous.

> **1.     Experience & Past Performance**

Supreme contends that as a result of a failure to consistently apply the RFP's size and complexity definition of relevancy, the Agency incorrectly classified the prior contracts submitted for evaluation. The size and complexity definition of relevancy was applied for Subfactor A (Experience) but was not followed for Subfactor B (Past Performance) evaluations.

Supreme would apply the relevancy parameters from Element A1 (Size & Complexity) of Subfactor A (Experience), to Subfactor B (Past Performance). Instructions for Element A1 (Size & Complexity) instructed an offeror to submit up to five contracts within the past twelve months of similar complexity and monetary magnitude. Contracts that did not meet this hurdle were not precluded, but could result in a downgrade or disqualification.

> Provide a brief performance record of up to five (5) of your highest dollar value or most comparable Prime Vendor/Regular dealer contracts (i.e., similar contracts to this one), for the prime contractor (to include equal partners) and subcontractors performing essential functions of the contract (this may be up to 5 for the prime and each partner, and up to 5 for each subcontractor) for the most recent 12 month period preceding the solicitation issue date (the "selected contracts") (note that not all submitted contracts may be evaluated   see explanation of evaluation procedures below). The performance records of the Prime Vendor and its equal partners will be more important than its subcontractors. These may be commercial or Government contracts and should be of similar size and complexity (e.g. 85%-100% of estimated dollar value, battlefield experience, number of delivery stops, number of delivery orders, etc.) of requirements as those found in this solicitation. Contracts determined not to be of similar size and complexity may result in a lower rating or may be determined to be irrelevant and not used in the evaluation. Specify which contracts you consider to be the most successful and why. Include any problems that you have encountered during the performance of the respective contracts and what steps were taken to resolve the problems, along with their resolution.

(AR Tab 1 at 244.)

The RFP's evaluation section had similar instructions for Element A1 (Size and Complexity).

> The Government will evaluate the offeror's experience in fulfilling similar requirements of similar size (85%-100%), and complexity for customers in a prime vendor/regular dealer capacity on an individual contract basis only for its most relevant (in terms of size and complexity) provided contracts. The provided contracts will be based on those submitted for the prime, joint venture participants, and the subcontractors performing essential functions of the contract, e.g., provided contracts may include three (3) from the prime and two (2) from the subcontractor.

(*Id.* at 264-65.)

Supreme contends that the foregoing requirements also applied to Subfactor B (Past Performance), citing language in the evaluative section of the RFP that the Agency would use an "integrated assessment" of Experience and Past Performance, "The Government will perform an integrated assessment of the offeror's experience and past performance." (AR Tab 1 at 264.) Anham was rated Marginal for Subfactor A (Experience) – Element A1 (Size & Complexity) and, Supreme asserts, Anham should have also received a Marginal in Subfactor B (Past Performance) rather than the Acceptable it did, because the Size & Complexity standards were not applied to Subfactor B (Past Performance) evaluations. Supreme asserts this comprised a prejudicial error of law from which it would have benefitted, due to a reduction in Anham's rating. This rating would have mitigated the downgrade given to Supreme for poor performance on a very small contract the Agency found not relevant for Subfactor A (Experience) but was factored into Supreme's rating for Subfactor B (Past Performance). Alternatively, Supreme asserts, this legal error requires an Agency reevaluation, applying the same relevancy definition to both Subfactor A (Experience) and Subfactor B (Past Performance).

Defendants disagree that the Size and Complexity instructions are conflated into Subfactor B (Past Performance). They rely on: (1) the language and structure of the evaluative Factors, Subfactors and Elements as well as the terms of the RFP; (2) Supreme's behavior in submitting prior contracts that met the Size and Complexity standards and prior contracts that met (or at least tried to meet) the customer satisfaction-centric standards of Subfactor B (Past Performance); and (3) the GAO's previous consideration and rejection of Supreme's position on this point.

The government contends that an integrated assessment under the Solicitation "is the application to the same past performance information that's submitted, the application of the four separate inquiries against that information. There's a specific inquiry under subfactor 1(a), there's a specific inquiry under subfactor 1(b), 1(c), 1(d) and so forth." (Tr. 73-74.) The evaluation criteria under Factor I, Experience/Past Performance, the introduction section prior to the subfactor specifics does not say that the size and complexity definition for Subfactor A, Element I would apply to the remaining subfactors. The only general statement of relevancy is "the most relevant experience in past performance data and that which will receive the most credit is the information directly related to the offering entity." (AR Tab 1 at 264.)

Also, in contrast to the Solicitation submission instructions, the Solicitation included different evaluative criteria. The evaluative section of the RFP delineated criteria to evaluate Subfactor B (Past Performance) which included customer satisfaction, consistently high fill rates and delivery of quality products, which would be applied to "provided contracts."

> Contract Performance/Customer Satisfaction   The Government will evaluate the offeror's record of performance with both commercial and Government contracts (if any) for its provided contracts. The Government will determine whether the firm has a successful history of conformance to contractual requirements or business agreements, providing consistently high fill rates, which meet the contractual requirements of 97%; a commitment to customer satisfaction; and timely delivery of quality products.

(*Id.* at 265.)

Instructions for Subfactor B (Past Performance) state that submissions by an offeror for Subfactor A (Experience) "will also be used to evaluate Past Performance (quality of performance) as well." (AR Tab 1 at 244-45.) No separate submissions were required. Anham and Supreme each submitted one set of prior contracts, several of which clearly did not meet the size and complexity instructions, an indicator that Supreme did not believe at that time that the size and complexity standards applied to both Subfactor A (Experience) and Subfactor B (Past Performance). Thus, the RFP contemplated that the Agency would evaluate the same information under both of the Subfactor A Elements and under Subfactor B.

Although Supreme cites Agency documents that assertedly applied size and complexity standards to Subfactor B as support, the subsequent record is clear that review was, under the subfactors, distinct as summarized in a Memorandum of Record for Inconsistencies Between Source Selection Plan and Solicitation that appears at the beginning of the Technical Evaluation Report of both Supreme and Anham.

> On February 24, 2012, the contracting officer issued a Memorandum for Record to the technical panel addressing specific inconsistencies between the solicitation and the source selection plan; specifically, in respect to Factor I, Experience/Past Performance. For Factor I, Subfactor B, the source selection plan required the technical panel to evaluate an offeror's past performance on contracts with comparable dollar value and delivery points. The solicitation, on the other hand indicated that for Factor I, Subfactor B, the "Government will evaluate the offeror's record of performance with both commercial and Government contracts (if any) for its provided contracts." The solicitation also states "the Government will determine whether the firm has a successful history of conformance to contractual requirements or business agreements, providing consistently high fill rates, which meet the contractual requirement of 97%, a commitment to customer satisfaction, and timely delivery of quality product" without reference to comparable dollar value or delivery stops to the solicitation requirements. Further, the size and complexity of an offeror's submitted contracts, with respect to dollar value and delivery stops was evaluated properly in accordance with both the SSP and solicitation under Factor I, Experience/Past Performance, Subfactor A, Experience, Element A1, Size and Complexity. At the direction of the contracting officer, the technical panel relied upon the evaluation language of the solicitation whenever it was in conflict with the source selection plan. In addition, based on the contracting officer's request, the technical panel documented whether the submitted contracts were relevant for each subfactor within Factor I.

(AR Tab 60 at 7921; Tab 61 at 8015.)

There is nothing in the submission requirements for element A1 (Size & Complexity) that extends its criteria beyond that specific subcategory, nor is size and complexity incorporated within subfactor B (Past Performance). Similarly, the submission instructions lack incorporation. The instructions for subfactor B (Past Performance) simply provide that "[t]he information provided in subfactor A Experience will also be used to evaluate Past Performance (quality of performance) as well" and that no additional information needed to be separately submitted. (AR Tab 1 at 245.) Moreover, the consequences of submitting prior contracts that did not

meet the required size and complexity was a possible downgrade or potential disqualification. (AR Tab 1 at 244 ("Contracts determined not to be of similar size and complexity may result in a lower rating or may be determined to be irrelevant.. ..").) No such language is contained in subfactor B. And to the extent that there are inconsistencies between the instructions and evaluative sections, *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007), bars late objections in this regard.

Anham submitted eight contracts for review. (AR Tab 60 at 7941.) The Agency determined only one of those contracts was "somewhat relevant" for size and complexity. Anham's SPV Iraq contract, for example, was approximately ███████ of the estimated dollar value of the instant procurement, and involved fewer delivery points. Anham received a Marginal rating for Size and Complexity (Subfactor A, Element A1). (AR Tab 60 at 7933.)

For Subfactor B (Past Performance), the Agency determined that all eight of Anham's contracts were

> relevant because the contracts . . . have fill rate, quality, and delivery requirements that are comparable to the SPV Afghanistan solicitation requirements for food delivery. Furthermore, the customer satisfaction, review of performance, and timely response/resolution to problems on other contracts with Anham, ███████ ██████ are relevant to how Anham may perform if awarded the contract under the current solicitation.

(AR Tab 60 at 7941.) For Anham's SPV Iraq/Kuwait/Jordan contract, "[t]he technical panel determined that the fill rate, quality, and delivery requirements . . . are similar to the fill rate, quality, and delivery requirements of this solicitation" and, therefore, "the most relevant for past performance evaluation purposes." (*Id.* at 7942.) With regard to the SPV Iraq contract, the technical report noted that "Anham's past performance demonstrated its ability to deliver quality goods with few exceptions in a timely manner, to all required locations within a contingency zone, in support of its contract requirements." (*Id.* at 7944.)

The Technical Review Panel also noted that some of Anham's submitted contracts were relevant for Factor I, Subfactor B (Past Performance) because they contained elements, such as fill rates in two subsistence prime vendor contracts,

customer service, and other quality factors that were relevant to Past Performance while not meeting the size and complexity requirement for Experience.

> Anham's past performance on its prime vendor subsistence contract for Iraq, Kuwait, and Jordan was given the most weight because it is the most relevant contract for evaluating past performance.... The subsistence prime vendor contracts of its partners was considered less important, but were also factored into the evaluation. . . . Additionally other factors considered by the technical panel in concluding that Anham should be rated Acceptable for Factor I, SubFactor B was because its fill rates, and the fill rates of its partners, frequently met the contractual requirement and all other required information was furnished.

(*Id.* at 7952.)

Concurring in the Acceptable rating for Anham for Factor I, Subfactor B, in its Revised Source Selection Decision Document following corrective action, ███████, Source Selection Authority, Deputy Commander, DLA Troop Support, concluded that "Anham's past performance record on its submitted contracts demonstrates that Anham has successfully conformed to previous contracts that had similar fill rate, quality, delivery, and customer satisfaction requirements." (AR Tab 64 at 8235, 8243.) In its decision, the SSA acknowledged that Anham's experience did not include the dollar amount and complexity of the SPV contract, in consideration of all the Factor I Experience/Past Performance components, Anham's overall technical rating for Factor I was Acceptable.

> With respect to Anham's overall technical proposal for Factor I, Experience/Past Performance, I recognize Anham has not performed on a contract as complex and which meets/exceeds the estimated dollar values of the one being proposed. However, its lack of experience is offset by the qualifications and experience of its proposed key personnel that demonstrates it can perform the requirements of the solicitation. Similarly, its established past performance demonstrates an ability to meet and conform to contractual requirements at an acceptable level. Anham's past performance with respect to socioeconomic considerations and AbilityOne demonstrates that even though Anham and its teaming partners do not reach all of the categorical goals set in their contracts, they have a performance record to show they support the programs. The Acceptable ratings for Subfactor I.A. and Subfactor I.B are equal to each other, but of greater importance than the Acceptable rating for Subfactor I.C and the Marginal rating, that Anham narrowly met, for Subfactor I.D. Overall, and based on the information above, the combination of the three Acceptable ratings (with a greater weight on two of the Acceptable ratings) and one Marginal rating, results in an overall technical rating of Acceptable for Factor I.

(AR Tab 64 at 8243.)

Supreme specifically objects to its downgrade in Factor I, Subfactor B (Past Performance), asserting that too much weight was given to its prior ███████████ Contract, which the Agency deemed "Not Relevant" under Subfactor A, Experience. Supreme submitted five contracts for evaluation. (AR Tab 61 at 8033.) The Technical Review Panel determined that all five were "relevant because the fill rate, quality and/or delivery requirements are comparable to the solicitation requirements for food delivery." (*Id.*) Supreme's Rating of Acceptable for Past Performance was based on more than the ████████Contract (for which Supreme does not contest its poor performance). The panel also cited Supreme's ████████contract in which it failed to meet its ███████targets███████████ percent of the time, as well as Supreme's████████contract, under which Supreme met its ███████████target less than████percent of the time. (AR Tab 61 at 8037, 8040.)

Applying the two different evaluation concerns, the SSA acknowledged Supreme's outstanding experience in contracts of the size and complexity proposed, as well as its unsatisfactory performance on a smaller contract and failure to improve after being so advised.

> Supreme's experience indicates it has performed a contract that exceeds the size and complexity of the solicitation's estimated performance in all aspects, to include annual dollar value, contractor on the battlefield experience, number of delivery points, average number of delivery stops per week, items on the catalog, average number of orders placed per week, average dollar value, and average total number of order line items per week. Similarly, at the individual personnel level, Supreme has experienced key personnel who are involved in the day to day management and oversight of the contract and have significant prime vendor and commercial food experience, knowledge of the food distribution industry, and knowledge of the geographical area supported by this contract. Supreme's previous experience, both at the corporate and individual level, indicates that it has managed and performed contracts that fulfill similar requirements as those of the solicitation on a contract with a higher dollar value and more complexity.

> Supreme's past performance on its contracts generally shows that it has performed good or better in meeting contractual requirements with the exception of one contract which indicated aspects of poor performance. For the most part Supreme successfully conformed to previous contracts that had similar fill rate, quality, delivery, and customer service satisfaction requirements. Supreme's references for its previous contracts have given Supreme satisfactory or very good ratings in the areas of quality of product or service, schedule, and business relations. Under the Subsistence Prime Vendor Afghanistan contract, Supreme also frequently exceeded contractual fill rates, and most instances when fill rate requirements were not met, were due to mitigating circumstances. For the one contract, however, the contracting officer indicates in CPARS that Supreme had performed unsatisfactory

in terms of ███████████████████████. Although Supreme's past performance demonstrates that it can meet the quality of performance and customer satisfaction requirements of contracts, the negative information on a previous Supreme contract demonstrates that there was one instance where it ████████████████████████████████ ████████████████████████████████████████

(AR Tab 64 at 8245.)

Overall, for Factor I, Experience/Past Performance Supreme received an Outstanding for Subfactor A (Experience), an Acceptable for Subfactor B (Past Performance), an Acceptable for Subfactor C (Socioeconomic Past Performance), and an Outstanding for Subfactor D (Ability One Past Performance ) – the latter two Subfactors given less weight than Subfactors A and B (*id.* at 8245-46), resulting in "an overall technical rating of Good, at the high end of a Good rating, for Factor I, Experience/Past Performance." (*Id.* at 8246.)

The Agency looked at submitted contracts of, or approaching, the size and complexity proposed for Subfactor A (Experience).  The Agency applied quality/customer satisfaction, particularly in attaining "high fill-rate" (supplying foodstuffs on time) in its evaluation of Anham under Subfactor B, looking at contracts of similar type, not necessarily of the same size as the subject procurement. (AR Tab 60 at 7939-52.)  These are distinct concerns.  *See Data Mgmt. Servs. Joint Venture v. United States*, 78 Fed. Cl. 366, 373 n.8 (2007) (noting evaluation of proposals based on the type of work performed, and separately on quality of performance that "[t]hese are not identical considerations").

Finally, the contracts Supreme submitted did not all meet the size and complexity requirements Supreme now contends were required.  Supreme submitted two contracts with annual values of ████████████ and ████████████ that fell within the 85 to 100 percent range identified in the Size and Complexity parameters, but also submitted three much lower dollar contracts with annual values of ████████████, ████████████ and ████████████.  (AR Tab 8 at 3485, 3493, 3499, 3503, 3506; AR Tab 61 at 8020-21).  Supreme clearly understood that these relatively smaller dollar contracts could have relevance for Subfactor B (Past Performance).  Indeed, Supreme contests the evaluation of only one of those three, not objecting to the other two. Even if there were some error in Supreme's Past Performance evaluation, Supreme cannot show prejudice because its technical proposal ultimately received an Outstanding rating.  Supreme has not demonstrated how a higher Past Performance rating would have increased its already Outstanding technical proposal.

The Agency's thorough consideration, evaluation and conclusions in these two Subfactors were well-grounded in the Solicitation. No valid basis for Supreme's Complaints of legal error in this regard has been established. Supreme advanced the same argument before the GAO and it was rejected.

> Supreme asserts that with respect to the agency's evaluation of Anham's proposal under the past performance subfactor, it was unreasonable for the agency to consider information regarding contracts that were deemed not relevant for the evaluation under the size and complexity element, and that Anham's rating under the past performance subfactor should have matched its rating of marginal under the size and complexity element.... Based on the record and the particular evaluation scheme in this solicitation, we disagree.

(AR Tab 66BB at 9321-22.)

After reviewing the Solicitation, including the "different sets of evaluation criteria for each of the factor 1 subfactors and elements" (*id.* at 9322), the GAO's conclusions rejecting Supreme's position in the second protest in this regard, while not binding, are supported by the record and are adopted here.

> Based on these provisions, we do not view the solicitation as requiring that the agency's relevancy determinations regarding the evaluated contracts be identical across the size and complexity and key personnel elements and the past performance subfactor. Although the solicitation's proposal submission instructions provided that contracts that were not of similar size and complexity to the solicited contract "may" result in a lower rating, only the size and complexity element included size and complexity as an express evaluation criteria.

(AR Tab 66BB at 9323.)

The GAO cited the Final Technical Evaluation Report for Anham dated December 5, 2012, that applied the distinction between Experience and Past Performance:

> With respect to the past performance subfactor, the record reflects that the agency contemporaneously documented the distinction between its relevancy determination under the size and complexity elements and its relevancy determination under the past performance subfactor. Specifically, the TEP's report states:
>
> > Some contracts included in Anham's offer were relevant for the evaluation of Factor I, Sub-factor B: Past Performance, but not for Factor I, Subfactor A, element A1 [Size and Complexity]. The [TEP]

> found that those contracts should be evaluated for "Sub-factor B: Past
> Performance" as those contracts contained elements, such as fill rates
> in two [SPV] contracts, customer service, and other quality factors
> that are relevant to "Sub-factor B: Past Performance" but not for
> Subfactor A, element A1 [size and complexity].

(*Id.*)

## 2.    Sustainment and Surge

Supreme also claims legal error in the Agency's rating of Anham's proposal
as "Marginal" for Subfactor A (Warehouse Location/Capacity and Resource
Availability) of technical Factor II (Distribution System/Quality Assurance),
following the responsibility evaluation discussed *supra*, yet Anham was rated
"Outstanding" for Subfactor E (Surge and Sustainment Capability) which Supreme
characterizes as the ability to respond to a sudden and dramatic doubling of demand
– the ability to respond to 200% of demand.  Supreme argues that the Agency had to
give Anham the same rating for both Subfactors, and that its failure to do so was
clearly erroneous.

> MR. HUMPHREY: They got an outstanding on surge for their ability to meet
> 200 percent when they had a marginal on their ability to meet 100 percent.  That just
> can't be squared, Your Honor.  If Anham doesn't meet the requirements to have
> enough warehouse to do 100 percent, then they don't have enough warehouse to do
> 200 percent.

(Tr. 44.)

Defendants disagree, citing the language of the Solicitation that Subfactors A
and E are separate, not duplicative.  Subfactor A ("Warehouse Location/Capacity and
Resource Availability) provides that "[a]n offeror needs to have, at a minimum,
distribution network capacity in Afghanistan" and that, in evaluating this capacity,
DLA would examine, among other things:  the location of the offeror's OCONUS
warehouses; the "nature of and risk attendant on the offeror's access to and control
over the warehouse(s);" whether warehouses were owned or leased; any necessary
construction; total available yard space for staging outbound products; the amount
and types of trucks and aircraft to be used; and plans for servicing and maintaining
vehicles and equipment.  (AR Tab 1 at 246-47, 266.)  Under Subfactor E (Surge and
Sustainment Capability) three factors were noted:  (1) facility support "available to
meet the surge requirements identified in [the] Surge and Sustainment" portion of the

Statement of Work, together with a discussion regarding "available yard space for staging of outbound product and their capability to ship and receive simultaneously"; (2) resource availability, with the offeror to demonstrate that resources will be "available to meet surge requirements" and to demonstrate their intended method and the lead-time necessary to obtain additional equipment; and (3) supply chain management. (*Id.* at 249.)

In Subfactor A (Warehouse Location/Capacity and Resource Availability) the Agency downgraded Anham following the responsibility evaluation because its warehouse construction was not complete. This concerned the evaluation regarding the "nature of and risk attendant on the offeror's access to and control over the warehouse(s)." (AR Tab 1 at 266.) That evaluation is not present in Subfactor E (Surge and Sustainment): "[t]he Government will evaluate the offeror's ability to reach the contractual requirement of 200% of normal demand levels." (AR Tab 1 at 267.)

The Agency described the reasons that it was rating Anham Outstanding under Subfactor E (Surge and Sustainment):

> Anham submitted a proposal describing in great detail its capability to exceed our requirement. Anham's proposal provided a clear picture of its capabilities to exceed the 200% contractual requirement in the areas of warehouse space, personnel and equipment. Anham provided details on how the supply pipeline will be maintained, how lead-times will be decreased and, details of a plan to expedite product from point-to-point as necessary. Additionally, Anham provided a transition plan that it will execute if awarded the contract. Anham's extensive supply chain experience is detailed in its proposal and also in its commitment to invest in its own in-country FF&V supply chain. Anham described the available yard space and facilities resources at six (6) locations to exceed our requirements. Anham also went into detail on the material handling equipment and trucks that are available to ramp up and exceed our requirements as well as its ability to obtain additional resources. Anham can ship and receive simultaneously at all locations and can provide additional containers to assist in exceeding our 200% requirement. Anham presented approximately 80 signed agreements with manufacturers, suppliers, and service providers to exceed our surge requirements. Therefore, Anham was rated Outstanding for Subfactor II.E, Surge and Sustainment.

(AR Tab 64 at 8271.)

The Agency acknowledged that the construction status of Anham's warehouses resulted in a downgrade to Marginal for Subfactor A (Warehouse

Location/Capacity/Resource Availability).[19]   Nevertheless, the pre-award responsibility data that led to that downgrade did not warrant a downgrade of Anham's Subfactor E rating:

> Although the information contained in the DCMA pre-award survey validated that Anham's warehouses were not yet completed and all MHE, trucking assets, and resources were not assigned to the various proposed warehouses, or necessarily in theater, the solicitation's requirements for surge, which is defined as the ability to ramp up quickly to meet early requirements normally needed within the first 45 days, and sustainment, which is defined as the ability to sustain an increased pace throughout the contingency(s) for six months or longer are exceeded by Anham's plan. Once Anham's performance on the solicitation begins, its plan demonstrated Anham's ability to ramp up to support the surge requirements within the required lead time and sustain those requirements as necessary. The findings of the DCMA pre-award survey are insignificant, and of little effect, when Anham's surge and sustainment plan is viewed in its entirety. Therefore, I have determined that Anham's technical evaluation for this subfactor should remain Outstanding.

(AR Tab 64, at AR 8273-74.)

No legal error is detected and the court will not second-guess the Agency's technical evaluation, particularly given the environment in which this contract is to be performed and the national security interests at stake. *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996); *see also Omega World Travel, Inc. v. United States*, 54 Fed. Cl. 570, 578 (2002) ("[C]ontracting officers are given broad discretion with respect to evaluation of technical proposals"). *See also Glenn Defense Marine (ASIA), PTE, Ltd. v. United States*, 720 F.3d 901, 907 (Fed. Cir. 2013).

Alternatively, Supreme has not established requisite prejudice even assuming that the Agency's evaluation of Subfactor E was incorrect. That is, even if the rating was reduced as Supreme proposes, it would not affect the "Good" rating Anham received for Factor II and, consequently would not have changed the award decision. To reiterate, the five technical factors are in descending order of importance. (AR Tab 1 at 261.) Within Factor II (Distribution System/Quality Assurance) there were five subfactors, including Subfactor E, "Surge and Sustainment Capability." Each of

---

[19] In this protest action, Anham insists "its proposal presented no serious risk that the offered warehouses would not be available in time to support contract performance and that [its] downgrade" to Marginal was in error. However, "for the purposes of this protest," Anham concludes the "downgrade was irrelevant." (ECF No. 32 at 69 n.23.)

those subfactors were of equal importance. (*Id.* at 240, 261-62.) Anham's Subfactor ratings were three Outstandings (one of which was for Subfactor E, "Surge and Sustainment Capability"), one Good, and one Marginal (AR Tab 65 at 8358), resulting in an overall "Good" rating for Anham for Factor II. (*Id.*) Supreme has not established that a reduction in Anham's rating for Subfactor E from Outstanding to Marginal, would have had any effect on its overall Good rating for Factor II. *See, e.g., B&W Serv. Indus., Inc.*, B-224392, B-224392.2, Oct. 2, 1986, 86-2 CPD ¶ 384 (no prejudice where reweighing of subfactors resulted in virtually same overall factor score). Further, given the over $1.4 billion price difference between Supreme's and Anham's proposals, Supreme cannot show that the requested change would have elevated its chance for the award.

**E.      Did the Agency adequately and reasonably investigate Supreme's claims of material misrepresentations in Anham's proposal concerning construction and operation of the Bagram Farms warehouse?**

Supreme alleged in these proceedings and before the GAO that the lease by Anham's affiliate of the approximately 300 acre[20] property from the Afghanistan government does not authorize the use of the property for the warehouse facilities proposed. Supreme has backed off its position, taken in briefing, that Anham made a material misrepresentation[21] in its proposal that it "has already secured all licenses

---

[20] The lease encompasses 600 jeribs which is represented to be approximately 300 acres, a matter that does not appear to have been disputed.

[21]

  THE COURT: I notice that you were withdrawing the position that you were taking originally on whether or not the Intervenor had a belief that they could use the building.

  MR. HUMPHREY: Yes, Your Honor, the issue was whether their claim constituted a material misrepresentation which required   we're not walking away from it completely. We think if you read that lease and they're [sic] affiliate was a party to the lease, the circumstantial evidence was such that you could conclude that they should have known at least that they didn't have the right to do what they were doing. But with the other issues that are pending, Your Honor, we just would rather have the Court focus on those that we think are more compelling. All these other documents that are pending before the Court in various motions to strike and motions to supplement have muddied the waters sufficiently that we don't want to take the Court's time on that.

(Tr. 53-54.)

and permissions to construct" and operate its Afghanistan warehouse located on a farm near Bagram, Afghanistan (the Bagram Farm warehouse). (ECF No. 27 at 28-35.)

A declaration, submitted in the GAO proceeding, by Anham's Chief Executive Officer (CEO), noted plans for use of the Bagram warehouse for the SPV contract and for agriculture development in Afghanistan thereafter:



(AR Tab 66U at 9020-21.)

"[T]o establish a material misrepresentation, [a protester] must demonstrate both that [the awardee] intentionally made a false statement and that [the agency] relied on that false statement in awarding the contract. . . ." *Sealift, Inc. v. United States*, 82 Fed. Cl. 527, 538 (2008) (citing *Blue & Gold Fleet, LP v. United States*, 70 Fed. Cl. 487, 495 (2006)). GAO previously found the claim to be without merit.[22]

> We cannot conclude on the record here that ANHAM's representation that the firm had "already secured all licenses and permissions to construct the facility" was false. As shown above, the record reflects that the issue of whether the Bagram site may be used for SPV purposes is in an apparent state of dispute involving ANHAM/BES[23/]

---

[22] "Given the diverse factual scenarios that appear before [GAO], its decisions traditionally have been accorded a high degree of deference by the courts, particularly those involving bid protests. While GAO decisions are not binding upon this court, they may be considered as expert opinion, which [the court] should prudently consider." *Glenn Defense Marine (Asia) PTE Ltd. v. United States*, 97 Fed. Cl. 568, 577 n.17 (2011) (internal quotations and citations omitted).

[23] Responding to several inquiries from DLA during negotiations, on December 7, 2011, Anham represented that:

> [w]ith regard to the Bagram Farm warehouse facility, this land is subject to a lease agreement between the Government of Afghanistan███████████████████

and various entities of the government of Afghanistan.  Evidence regarding the dispute and representations that ANHAM has made to our Office are sufficiently consistent with ANHAM's proposal statement to preclude our finding that a misrepresentation occurred.  Ultimately, it is up to one or more branches of the government of Afghanistan to resolve the dispute.  Whether future actions by the government of Afghanistan ultimately enable or prevent ANHAM from using the site for SPV purposes is a matter of contract administration, which our office does not review.  Supreme's claim of a proposal misrepresentation is denied.

(AR Tab 66 at 9316 (footnote added) (citations omitted).)

At oral argument in these proceedings, Supreme recast its position as one of responsibility, claiming the Agency erred as a matter of law in failing to adequately investigate, as part of its responsibility evaluation, claims about Anham's right to use this property in the performance of the SPV contract.  In this regard, Anham's proposal represented that it "has already secured . . . permissions to construct the facility."  (AR Tab 6A at 841.)

Supreme correctly contends that 48 C.F.R. § 9.105-1(a) requires the CO gather sufficient information for its responsibility evaluation of the sufficiency of the putative awardees' facilities to perform the contract.[24]  During corrective action following the first GAO protest, Supreme sent a letter to the CO questioning whether Anham had legal authority to use land that it had leased from the Afghanistan government to use for a warehouse to supply fifty-one percent of Anham's proposed warehousing capacity.

In contesting the adequacy of the CO's responsibility investigation, Supreme complains that the Agency officials involved were located in the United States, not



(AR Tab 17 at 4906.)  This was verified by DCMA in its responsibility evaluation.  (AR Tab 40 at 6475 (finding Anham "is entitled to the possessory interest in and to the land comprising the [Bagram] Farm by virtue of its ownership in BES ... ANHAM has 'ownership' in the company that maintains possessory interest in and to the land for the Bagram Farm Warehouse.").)

[24] 48 C.F.R. § 9.105-1(a) provides that "[b]efore making a determination of responsibility, the contracting officer shall possess or obtain information sufficient to be satisfied that a prospective contractor currently meets the applicable [responsibility] standards [of Section] 9.104."

in Afghanistan, and the questions raised concerned matters of Afghanistan law. Supreme argues that the Agency charged with making an investigation of responsibility should have, and easily could have, made inquiry of officials of Afghanistan, the country receiving American support.[25] Enough questions were raised that the Agency, charged with evaluating responsibility in this large contract, should have done its own investigation of Anham's right to use this leased property as proposed. An adequate investigation would have concluded, Supreme argues, that Anham does not have that right, precluding the responsibility findings, and the contract award. Supreme asserts that as a matter of law, the Agency's analysis was weak and its investigation close to nil. The procurement error asserted is lack of effort on the part of the Agency.

Questions of lack of investigation aside, Supreme points out that while the lease as translated allows for a warehouse, it is also limited to agricultural purposes; accordingly, Supreme concludes use is limited to warehousing of agricultural products, not the commercial grocery items in the procurement. Supreme asserts that a reasonable independent investigation and responsibility determination must be made when serious questions like this are raised, and that the lack of investigation here was *per se* unreasonable.

Supreme points to the CO's December 5, 2012, Memorandum of Record describing his reaction to the October 26th letter from Supreme's counsel as sparse, indicating only that "[i]f the original award decision is affirmed, DLA would not need to reconsider the original responsibility determination." (AR Tab 57 at 7908.) Two days later, on December 7, 2012, Anham again was awarded the contract. The lack of further investigation was error in these circumstances, Supreme contends. Indeed, Supreme adds that the GAO found this rationale insufficient and that is why the CO was called to testify. (Tr. 51.) Supreme notes the CO's testimony was clearly post-award; no discovery was allowed; no documents were produced; and no cross-examination was allowed.

In *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) cited by Supreme, the CO failed to investigate or read a document that was in Italian. Similarly, documents here were in Dari. The CO in

---

[25] When questioned by the court whether Agency inquiry of Anham for particulars of the lease and business plan apparently referenced therein, would constitute prohibited discussions, counsel for Supreme said no, as long as the inquiry is limited to whether Anham can perform as proposed. (Tr. 48.)

*Impresa* also made assumptions concerning receivership proceedings that lacked factual support.   Analogously, Supreme asserts that here the CO assumed that the Afghanistan lower house of Parliament did not have the power to declare the lease invalid, a declaration in the October 26th letter.  Supreme contends that the CO made unfounded assumptions that were not the product of a reasonable investigation.

The substance of Supreme's letter, defendant counters, does not foster the obligation Supreme advances.  The letter (AR Tab 48 at 7759-97), accuses Anham of misrepresentations in its proposal, claims that Supreme has now dropped.  The letter stated that it had been widely reported in the press that Anham was facing major legal problems, as well as Afghan government and community opposition to the use of the Bagram Farm warehouse for this contract.  No substantiating information was provided and the government represents that it is not aware of any.  The letter also alleged that several Afghan agencies were calling for the demolition of the warehouse.  The government was not aware of any such demands.  (Tr. 87.)  As for the letter's statement that "[a]ccording to the National Economy Committee of the National Assembly and local Afghan community leaders, Anham is constructing a warehouse on land it does not own and for which its does not have proper authorization to use for that purpose," Supreme qualified that statement, admitting that it is not sufficiently familiar with Afghan law to verify that Anham has acted illegally in these matters.  (AR Tab 48 at 7761, 7762 n.1 ("Supreme is not sufficiently familiar with the facts and Afghan law to verify that Anham has acted unlawfully as alleged.").)  Supreme also admitted that questions concerning Anham's right to use leased land for the warehouse purposes contemplated were "rumor and speculation." (AR Tab 66J at 8730.)  Finally, the letter asserts that a similar incident occurred in Kuwait when Anham improperly attempted to take control of public property.  As for that allegation, the CO testified in the GAO proceedings that he knew that was not correct.  "The proposal and the DCMA survey indicate to me that Anham could operate on that land, sir."  (AR Tab 66X at 9169. )  "[T]he [CO] is not aware of any independent information substantiating the allegations raised by Supreme which would warrant further inquiry."  (AR Tab 57 at 7908.)

Also the CO (with more than thirty-five years experience) was aware from the pre-award survey that Anham had a lease, that DCMA had observed Afghan guards patrolling the construction site and facilities, and reasonably determined that if Anham had wrongfully seized this property and was building unauthorized

warehouses, the Afghanistan government would not be policing the site.[26] Furthermore, from photographs, the CO was aware of this massive structure and from his experience in this area, knows such a structure is not built without local authorities' knowledge. If Anham was acting outside of its legal rights, those local authorities knew how to stop further construction.

The CO considered Supreme's October 26th letter "very seriously." (AR Tab 66 X at 9139.) The CO acted reasonably. He immediately distributed it to the other contracting officials. Subsequently there were approximately five meetings of those individuals and the unanimous consensus was that the allegations were not credible. (Tr. 89.) He forwarded the letter to two other DLA contracting officers working on Afghanistan food service contracts, and to his supervisor, █████████. (AR Tab 66X at 9093-94 ("[W]ithin an hour or two of receiving [the letter], the four of us got together . . . to discuss the letter and see what each other's take was of the letter.").) The CO also discussed the matter with counsel and senior DLA leadership including Director of Subsistence Directorate █████████and the Deputy Director of Subsistence Directorate█████████. (AR Tab 66X at 9193-95.) Within a week of the letter's receipt, the CO recalled as many as five meetings to specifically discuss the allegations and any follow-up. (AR Tab 66X at 9195.) The CO concluded that Supreme's allegations did not merit additional investigation. (AR Tab 57 at 7908.)

Supreme submitted additional documents at the second GAO proceedings, including another translated copy of the lease. (AR Tab 66B at 8505-14.) But as Anham points out, Supreme's claim that warehouses could not be built on the

---

[26] Dennis Strolle testified in the 2013 GAO proceeding that he had been a CO since 1977. (AR Tab 66X at 9076.) DCMA's report included photographs of substantial, and highly visible, construction efforts at Bagram. (AR Tab 40 at 6323-25; 6485 (describing walls, guard towers, and other improvements).) The CO testified that he was aware of this information. (AR Tab 66X at 9087.). At a subsequent post-award conference in June 2012, charts with pictures of the Bagram warehouse were presented by Anham which the CO testified depicted "much progress from the pictures we had seen from the DCMA." (AR Tab 66X at 9090.) October 4, 2012 photos from Anham depicted substantial progress on warehouse construction. (AR Tab 46 at 7744-48 (the Bagram warehouse and loading bays, refrigeration systems, storage facilities, and interior work spaces).)

The CO found this progress to be consistent with Anham's ownership interest in, and use of the land despite Supreme's claims the land had been confiscated. (AR Tab 66X at 9183.) DCMA's pre-award survey also verified that 35 guards from the Afghanistan Public Protection Force ("APPF") were on the Bagram site, securing the facilities at the time of the visit. (AR Tab 40 at 6485; Tab 66X at 9182.)

property was belied by the provision in the lease that "[l]easeholder can build necessary buildings ([o]ffices, warehouses, parking, garage, and all necessary buildings) for activities up [to a] maximum of 3% of leased land." (AR Tab 66B at 8513.) And, the lease specified that in the event of a dispute over the use of the land or otherwise, "both parties are required to refer to an authorized court [in] Afghanistan." (AR Tab 66B at 8513; Tab 66BB at 9316 (GAO noting that it is up to one or more branches of the Afghan Government to resolve any dispute). Anham notes that Supreme does not contend that any such legal action has been filed or threatened by the Afghan Government. Accordingly, to the extent that Supreme's misrepresentation claim emerges again, Supreme has not, demonstrated that the Bagram warehouses violate the lease, much less that Anham was aware of this at the time it submitted its proposal.

In this regard, Supreme tenders yet another, arguably more favorable, lease translation that excludes the reference to warehouses. (ECF No. 27-1.) The new translation also refers to a plan that, according to the translation, should appear as Attachment 4 to the lease, but no such document is attached. (*Id.*) Supreme also cites to a document titled "Boustan Sabz Strategic Plan 2008 – 2012." (ECF No. 27-2.) Neither this lease translation nor the Strategic Plan were part of the AR and are the subject of the pending motion to strike. Even if the Strategic Plan was considered, it is not identified as the referenced Attachment 4 to the lease tendered. The document is described as a general strategic plan covering only four years (2008 to 2012). It bears no relationship to the lease or the contract award in that it is not specific to Bagram Farm, the Anham warehouse site, but rather refers to a larger long-term plan ██████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████

Additionally, on the merits, assuming *arguendo* the availability of all Supreme's documentation, with all the information now before the court, it cannot be determined that Anham is not able to use the leased Bagram Farms property as proposed. While there are slight variations in translated versions of the lease, the dispute provision in all translations, provides in pertinent part that in case of a conflict both parties are required to refer the matter to an authorized Afghanistan court. There is no evidence or suggestion in the AR that such a reference occurred and in all the massive submissions in this matter, there is no threat of an imminent lawsuit over Anham's use of the property. In this regard it is noted that Supreme has not pointed to any objection to the use of the property for the warehouse by the Afghan Ministry of Agriculture, Irrigation and Livestock, the party signing the lease.

Accordingly, *Impressa* is distinguishable because there it was clear that had the CO investigated, the offeror would have been debarred and accordingly disqualified under procurement requirements.

Were the court to consider the newly-translated documents concerning the use of the Bagram Farms property, for which AR supplementation is sought, Anham has submitted several local government documents in support of its use of the property. One document is a letter from the Afghan government concluding that the original Afghan government letter, submitted with Supreme's October 26th letter, was not an official action. A second document is a letter from the Ministry of Agriculture, Irrigation and Livestock (the leasing entity), expressing support for Anham's use of the Bagram property. (Anham's Reply, ECF No. 39.) As noted, photographs of the massive warehouse in open and obvious terrain, provision of site security by Afghan law enforcement, and the absence of any evidence of commencement of Afghan legal proceedings between the leasing parties or others, provide firm support for the CO's responsibility determination rather than Supreme's claims of error in this regard.

## F.    Supreme has not established prejudice.

Although addressed in some of the discrete issues above, Supreme failed to establish prejudice, even if any of the asserted violations of procurement law were credited. Prejudice is a hard-wired pre-requisite to relief for violations of procurement law or regulation.

> MR. MARCOTTE: [Prejudice is] particularly important in a case like this where you have an incumbent like Supreme, you've got a fluid, changing situation in Afghanistan where it's Supreme's dream to say any nit or nat that we find here, send it back, we'll just clean up the record and it will be perfect. But the time that it takes to do that ends up with DLA unable to move to a new awardee, to a new contract which is more advantageous and which offers $1.45 billion difference between the two proposals.

(Tr. 98-99.)

The six-month ramp-up provision of the procurement was not relaxed for Anham and even if it were, Supreme can show no relevant prejudice as Supreme, the incumbent, was already performing and did not need to ramp-up. Although Supreme's bridge contract expires on December 12, 2013, it is subject to early

termination.[27/]   The rating errors alleged were not established to have altered the Agency's best value determination, particularly given the very large price difference. The responsibility determination was not shown to have been inadequate or legally erroneous, such as to have eliminated Anham as the putative awardee or reopened Agency evaluation.

## V.    MOTION TO SUPPLEMENT AND MOTION TO STRIKE

Recently the Federal Circuit instructed that "[a]ll of the materials submitted to the GAO are part of the administrative record before the Court of Federal Claims. 31 U.S.C. § 3556." *Glenn Defense Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 911 n.8 (Fed. Cir. 2013).  As for matters submitted initially in this protest litigation, supplementation is not necessary to permit "effective judicial review." *Axiom Res. Mgmt, Inc. v. United States*, 564 F.3d 1374, 1380 (Fed. Cir. 2009). Accordingly, Supreme's Motion to Supplement the Administrative Record (ECF No. 35) and Intervenor's Conditional Cross-Motion to Supplement (ECF No. 41) are **granted in part** as to material submitted to the GAO and otherwise **denied**, and Intervenor's Motion to Strike (ECF No. 31) is **granted**.

## CONCLUSION

For the foregoing reasons, Supreme's Motion for Judgment on the Administrative Record (ECF No. 26) is **denied** and Defendants' Cross-Motions (ECF Nos. 29 & 32) are **granted.**  The Clerk shall enter judgment accordingly.

s/ James F. Merow_____
James F. Merow
Senior Judge

---

[27/] Supreme's bridge contract, not part of the AR, runs through December 12, 2013.  The J&A indicates that it is subject to early termination if the need for the bridge contract ends.  (AR Tab 44 at 6759.)